Marilyn D. Katz SANTARELLI, Plaintiff-Appellant, and Cross-Appellee,

v.

Louis KATZ, Florence Katz, et al., etc., Defendants-Appellees, and Cross-Appellants.

Marilyn D. Katz SANTARELLI, Plaintiff-Appellant and Plaintiff-Appellee,

v.

CITY NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as Executor of the Estate of Louis Katz, deceased, Florence Katz, et al., etc., Defendants-Appellees and Defendants-Appellants.

Nos. 12488, 12489.

United States Court of Appeals Seventh Circuit.

July 2, 1959.

Rehearing Denied Oct. 16, 1959.

On Further Petitions for Rehearing Oct. 22, 1959.

Schnackenberg, Circuit Judge, dissented in part.

---

Russell J. Topper, Edward Hershenson, Nathan Kessler, Chicago, Ill., for Marilyn D. Katz Santarelli, appellant.

Virgil C. Lutrell, W. Russell Arrington, Chicago, Ill., appellees and cross-appellants.

Albert E. Jenner, Jr., Chicago, Ill., for City Nat. Bank & Trust Co. of Chicago.

Before DUFFY, Chief Judge, and SCHNACKENBERG and KNOCH, Circuit Judges.

DUFFY, Chief Judge.

Marilyn D. Katz Santarelli (Marilyn) brought a trust beneficiary's stockholders' derivative suit against officers and directors of Elkay Manufacturing Company (Elkay), an Illinois corporation, for alleged misappropriations of corporate assets and diversion of corporate opportunities. In addition, plaintiff asks that defendant Louis Katz be held liable to her for breach of the terms of an inter vivos trust created by her grandfather, Leopold Katz, and she seeks an accounting and a return of the assets of the trust.

Elkay was organized on November 27, 1922 by Leopold Katz, Louis Katz and one Robarth, and has been engaged in the business of manufacturing and selling sheet metal and sheet metal products. Louis Katz, Florence Katz, his wife and Louis G. Katz, their son, have since 1940 been the principal stockholders, officers and directors of the company and have had control of its business affairs. These three defendants have been directors of Elkay as follows: two of the authorized total of three directors for each of the years commencing 1940 and ending 1945; at least three of the five authorized directors for each of the years commencing 1945 and ending 1952; and at least two of the five authorized directors for each of the years commencing 1952 and up to the date of the trial. For all the trust period up to November 8, 1956, the Katz family owned 70% to 90% of the outstanding common stock, and owned or controlled 70% to 90% of the outstanding preferred stock.

On December 11, 1936, Leopold Katz, the paternal grandfather of Marilyn, executed an inter vivos trust agreement in which Louis Katz was designated Trustee for Marilyn, then aged five, and for her sister, Marcelle, then aged ten. The trust estate consisted of seven hundred fifty shares of the common capital stock of Elkay. On that date there were forty-six hundred shares of common capital stock outstanding.

In her derivative suit, plaintiff has directed a broad attack on the management of Elkay. Each of the criticised transactions will be discussed separately. Illinois law must be applied in seeking an answer to the legal questions thus presented.

### Diversion of Scrap Metal Assets.

The manufacturing processes of Elkay have produced various amounts of stainless steel and iron scrap. During the years 1940 to 1950 proceeds from the sale of this scrap metal went to Louis G. Katz and Ronald Katz, sons of Louis Katz, as "additional compensation." This disposition of scrap assets was not reflected on the corporation's books, nor was it revealed in the corporation tax returns. The record discloses no authority for this practice by way of resolution by the Board of Directors but shows that the practice began early in the history of the corporation when the amounts involved were trivial and served initially to compensate Louis G. Katz in his boyhood for errands and other small tasks.

The proceeds from the sale of scrap increased over the years. No corporate or other records are available as to the total proceeds of scrap sold from 1940 to and including 1950.[1] The Katz family admits there were scrap sales amounting to $42,618.72 from the period from 1943 to 1949. A report from Arthur Young & Co. indicates scrap sales of $11,326.73 in 1950. Plaintiff claims that known scrap sales for the entire period totaled at least $71,065.23.

The practice of diverting the proceeds from the sale of scrap was questioned by Paul Sternberg, who was the treasurer of the corporation. He testified " * * * After this money became more

than an inconsequential sum, I brought the matter up to the Board although I do not know whether it was at a Board meeting. I brought it up to Mr. Katz's attention at one time and to Mr. Harris, who was president of the company at one time. It was the general feeling that handling it in the manner it had been handled in the past was not going to hurt the corporation in any way. * * * " Cautionary warnings were also given by Russman, the Auditor of Elkay.

In 1950, the Internal Revenue Department investigated the handling of the proceeds from the sales of scrap and levied a deficiency income tax assessment amounting to $17,119.78, including penalties and interest. The tax deficiency rested upon the basis that all the income from the scrap was the property of Elkay and taxable as such. The taxing authorities refused to allow the scrap payments as legitimate executive compensation, but did find that the failure to report same as corporate income was not fraud.

The District Court regarded the mishandling of the scrap assets as "reprehensible" but, relying on the Revenue Department's failure to find fraud in the practice, held that the defendants were not liable by reason thereof to the corporation.

We think it is immaterial that the services rendered by Louis G. Katz and Ronald Katz might conceivably be held to be adequate consideration for the "additional compensation paid."[2] The controlling fact is that there was no Board resolution, charter provision, by-law, nor express contract which authorized the payment of corporate monies derived from the sale of the scrap metal. The amounts so paid for the years 1940–

---

1. In 1951, for the first time, proper records were kept of the proceeds from sales of scrap. The books of the corporation since 1951 list the scrap as corporate assets and the income therefrom as corporate income.

2. In 1940, when the diversion began, Ronald Katz was three years old. Louis G. Katz had assumed the office of assistant treasurer and received a salary pursuant to Board resolution which, when added to his scrap income, made his total compensation from the corporation greater than that of the treasurer during at least three of the years in question.

1950 must be returned to the corporation. See Brown v. DeYoung, 167 Ill. 549, 47 N.E. 863; Hall v. Woods, 325 Ill. 114, 156 N.E. 258.

■ The lack of corporate records as to the proceeds from the sale of scrap in 1940, 1941 and 1942 should not operate to the prejudice of plaintiff. She was in no way responsible. A reasonable approximation of the value of the scrap assets diverted in 1940, 1941 and 1942 should be made upon remand in accordance with the principles announced in Barnett v. Caldwell Furniture Co., 277 Ill. 286, 115 N.E. 389; Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684, and Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544.

Diversion of Corporate Opportunities.

The erection of the Timmus Building at 7204 West 60th Street, Summit, Illinois, and the purchase of the Arthington building at 4703–07 Arthington Street, Chicago, are the basis of charges by plaintiff that each was a diversion of a corporate opportunity.

(a) *Timmus Building:*

The District Court found that defendants' decision to organize Timmus Corporation and the lease agreements between that Company and Elkay were made in entire good faith and in the exercise of sound business judgment, and held that plaintiff's asserted claim in respect to this building must fail.

Plaintiff insists that without regard to the fairness of the transaction, a constructive trust must be imposed because four of the five directors of Elkay, during this period, were also the directors of Timmus, and with the exception of one Callanan, these directors were the sole stockholders of Timmus. Plaintiff cites such cases as Winger v. Chicago City Bank & Trust Co., 394 Ill. 94, 67 N.E.2d 265, and Central Railway Signal Co. v. Longden, 7 Cir., 194 F.2d 310. In the latter case we applied Illinois law.

By early 1952, Elkay needed new quarters for its expanding manufacturing operations. An extended search was made to find buildings that could be leased, but none were found that were satisfactory. Sternberg, for Elkay, then contacted several insurance companies in an endeavor to have an insurance company build the building and lease same back to Elkay. Prudential Insurance Company showed some interest and sent two men to look over Elkay's plants and operation. However, because of Elkay's then financial condition, Prudential decided it was not interested in a lease-back arrangement. At about this time Elkay was having difficulties with the City National Bank, which was pressing for the payment of existing loans, and had stated that it did not desire to make further loans for expansion.

Timmus Building Corporation was incorporated on June 17, 1952. The officers of Timmus pledged their personal credit and obtained funds from the City National Bank to erect a steel factory building. The main building comprised 40,000 square feet, and a boiler room of 790 square feet. The building was leased to Elkay for fifteen years at an annual rental of $40,000 net. In 1953, Prudential made a loan of $175,000 to Timmus secured by a mortgage on the new factory building and an assignment of the rents under the lease to Elkay. The proceeds were used to pay off the bank loan at the City National Bank which had been personally guaranteed by the officers of Timmus.

In 1955, an addition to the building was erected consisting of 21,700 square feet; the old lease with Elkay was canceled and a new lease executed providing for a net rental of $60,000. At this time Prudential made a new loan to Timmus for $260,000, part of which was used to pay off the old loan and the balance was used to pay for the addition to the factory building.

In 1952, the demand for industrial buildings was much greater than the supply for the type of building required by Elkay. An emergency arose because Elkay either had to build a new building or lease additional space. When the di-

rectors found there was no suitable building or buildings available for lease, and that insurance companies were unwilling to enter into a lease-back arrangement, the directors of Elkay pledged their personal credit, and by reason thereof, the much-needed new buildings were forthcoming.

There is no claim that the amount of rent charged Elkay was excessive nor that any of the terms were unreasonable. In fact, there is strong evidence to the contrary. The contention of plaintiff comes to this—if four of the directors of Elkay were willing to pledge their personal credit to obtain financing for Timmus, a company which they, in effect, owned, they were bound to do the same thing for Elkay. We agree with the District Judge that Illinois law does not go that far.

A transaction such as we are considering must bear the closest scrutiny. We agree with Judge Cardozo that: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. * * * "[3] Nevertheless, the District Court found the defendants showed utmost good faith. An important factor is that Elkay was itself unable to provide these buildings so essential to its expanding business. The directors did not take something away from Elkay that it was entitled to have. We agree with the District Court there was no breach of a fiduciary relationship when the directors on their own personal credit, obtained for the benefit of Elkay something that Elkay could not itself provide.

(b) *Arthington Building:*

Plaintiff's asserted cause of action as to the Arthington Building presents a closer question than her claim as to the Timmus Building. There is no definite and specific proof that at the date when Louis and Florence Katz purchased the Arthington Building, Elkay was unable to do so. However, the property cost $15,000, and Mrs. Katz paid $10,000 on the remodeling job. There is evidence that these improvements were suited only to the particular use made of the property by Elkay. The sum of $16,800.13 was expended by Elkay for certain improvements and a bit later the additional sum of $9,964.71. However, the latter sum was later repaid by Louis and Florence Katz.

We would have been better satisfied had the evidence specifically described Elkay's financial condition on September 12, 1940. However, it was a reasonable inference for the trial court to make that on that date it was not financially feasible for Elkay to have purchased the Arthington Building.

The reasonableness of the rent paid by Elkay is clear. The property was used by Elkay for seventy (70) months and the net rental paid for this period was $42,000, or an average of $600 per month. From 1946 to 1950, this same property was rented to another tenant at $625 per month. From 1950 to 1955 Elkay again rented the property and in spite of inflationary trends, paid the same $625 per month as had the former tenant. The record shows that the tenant in possession at the time of the trial was paying $800 per month.

The judgment of the District Court as to the Arthington Building is affirmed.

### Death Benefit to President's Widow, Salary to Wife of Board Chairman, and Alleged Excessive Executive Compensation

In its brief, plaintiff complains of monthly payments to Lucille R. Katz, widow of Louis G. Katz, who was the president of Elkay at the time of his death. The monthly payments were to be equal to decedent's salary the last month of his life. Such payments were continued for five and a half months. However, the resolution of the Board of Directors authorizing such payments,

3. Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545–546, 62 A.L.R. 1.

and pursuant to which payments were made, was not passed until nine months after the filing of the instant suit. Obviously the complaint made no reference thereto. There was no supplement to the complaint filed to cover this transaction. The District Court was correct in not considering this charge.

On January 26, 1953, the Board of Directors of Elkay authorized payment of annual salary and bonuses to Florence Katz, the wife of Louis Katz who was then Chairman of the Board. The payments, in round figures, were made as follows: In 1953—$10,500; in 1954—$13,000; in 1955—$14,000; in 1956—$8,000. This is an average of approximately $11,375 per year. The resolution stated the payments were: " * * * for her services in attending conventions, sales meetings and creating interest in Elkay's products among women in attendance at such conventions, and for her services as Second Vice-President and Assistant Treasurer." Florence Katz attended three or four conventions a year during the period from 1953 to 1956, inclusive. Each of these conventions was from three to five days' duration. Plaintiff claims the payments in the four years in question totaling $46,431.60 had no relation to the value of her services and should be repaid to Elkay. The District Court did not specifically mention this claim of plaintiff but as the entire derivative action was dismissed, the Court necessarily disapproved of such claim.

After hearing plaintiff's evidence, the District Court held that the compensation paid to Elkay's executives was fair and reasonable and in no way excessive. Plaintiff argues on appeal that the evidence which she presented constituted a *prima facie* showing of illegality and excessiveness, and that defendants should have been required by the Court to bring in proof in defense of their actions. Thus the question presented to us is not whether the District Court's finding is clearly erroneous, but whether the Court was in error in ruling out this issue at the close of plaintiff's case. In other words, was there a *prima facie* showing made?

██ Normally, a stockholder bringing a derivative suit against the management of a corporation, carries a heavy burden. Courts are properly reluctant to interfere in corporate matters that are traditionally regarded as being within the ambit of "business judgment." However, if a stockholder is being unjustly deprived of dividends that should be his, a court of equity will not permit management to cloak itself in the immunity of the business judgment rule.

The facts brought out by plaintiff upon the trial call for a most careful consideration by a court of equity. The Katz family was in complete control of the corporation by virtue of its ownership and control of from 70% to 90% of the common as well as the preferred stock. In the years 1951 to 1956 the compensation paid to Elkay's executives Louis Katz, Florence Katz, Louis G. Katz and Paul Sternberg, was authorized by resolution by the Board of Directors composed of Louis Katz, Florence Katz, Louis G. Katz and Paul Sternberg. Thus these individuals each sat on both sides of the table.

No Illinois case has been cited, and we know of none, as to what showing of irregularity is necessary for the establishment of a *prima facie* case. Defendants cite three New York cases.[4] These cases list many elements essential to a plaintiff's case in proving the charge of excessive compensation which are absent from the plaintiff's case here. These cases are not very helpful to defendants because they clearly state a rule which defeats defendants' argument. In the Gallin case (see footnote 4), the Court said, at page 118, of 273 N.Y.S.: "The present case is rendered difficult and unusual by reason of the circumstance, among others, that here the overwhelm-

4. Gallin v. National City Bank, 152 Misc. 679, 273 N.Y.S. 87; Mann v. Luke, 272 App.Div. 19, 68 N.Y.S.2d 313; Stearns v. Dudley, Sup., 76 N.Y.S.2d 106.

ing majority of the directors were financially disinterested in the compensation voted. A relatively simple case is presented where the entire board, or an overwhelming majority, vote, as directors, compensation *to themselves* as officers, or worse, as a mere incident to their office as directors. Such action is presumptively fraudulent and voidable at the instance of a minority stockholder, and the burden in such cases is on the directors to show that their acts were fair and reasonable. * * *"

The rule stated in the last sentence of the above quotation is also found in Carr v. Kimball, 153 App.Div. 825, 139 N.Y.S. 253, affirmed 215 N.Y. 634, 109 N.E. 1068; Atwater v. Elkhorn Valley Coal & Land Co., 184 App.Div. 253, 171 N.Y.S. 552, affirmed 227 N.Y. 611, 125 N.E. 912, and Schall v. Althaus, 208 App.Div. 103, 203 N.Y.S. 36. The Schall case involved a fact situation much like the case at bar. The rule is founded on the well-established equity principle that where a trustee deals with himself, he assumes the burden of proving the *bona fides* of the transaction.

■ It is the burden of the defendants to show the reasonableness of the compensation they paid to themselves from the corporate treasury. The presumption is that they acted in their own interest. Upon remand, the District Court should determine whether defendants' evidence, if any is offered, meets the burden of proving the fairness of the compensation paid to Elkay's executives. The same holds true as to the payments made to Florence Katz. Upon remand for consideration of plaintiff's claim as to these payments, defendant W. Russell Arrington should be before the Court together with the other defendants. The order dismissing defendant Arrington at the close of plaintiff's case is reversed.

### Leopold Katz Trust.

On December 11, 1936, Leopold Katz executed a trust indenture setting up a trust for the benefit of two grandchildren, one being Marilyn, the plaintiff herein, and the other her sister, Marcelle. The trust *res* consisted of seven hundred fifty shares of common stock of Elkay out of a total outstanding issue of forty-six hundred shares. Louis Katz was designated trustee. The trust was to continue until each beneficiary reached the age of twenty-five years, whereupon her share was to be transferred to her. Plaintiff reached the age of twenty-five on May 12, 1956.

Paragraph 14 of the trust indenture provided: "The Settlor desires to provide against the introduction of strangers or outsiders deriving interests as stockholders of the Elkay Manufacturing Company through the purchase of any share or shares of stock from the beneficiaries hereunder, and therefore directs that those of the present stockholders who remain in said business as stockholders therein shall have the option to purchase and acquire the whole of the stock interest of the beneficiary or beneficiaries hereunder who desire to sell or transfer the shares acquired hereunder according to the book value thereof; said beneficiaries so desiring to sell, transfer or deliver his, her or their shares shall first allow said present stockholders a period of thirty (30) days in which to exercise the option as hereinabove stated."

Paragraph 17 of the trust indenture provided: "The said trustee, Louis Katz, shall not be held liable for any loss or damage to the trust estate, unless such loss or damage be caused by his personal gross misconduct or wilful misfeasance."

Broad powers to administer the trust were given to the trustee under paragraph 13. He was authorized to continue to hold any and all property or securities received by him at the commencement of the trust, and to invest the trust estate without being restricted to investments for trustees as fixed by the Statute of the State of Illinois. There was also the provision: " * * * The trustee also shall have the power of determining how all receipts and disbursements shall be created, charged or apportioned as between income and principal

and the decision of the trustee shall be final and not subject to question by any beneficiary of the trust. * * *"

■ During the administration of the trust, Elkay issued some preferred stock. The trustee did not subscribe for any of this stock for the trust. The District Court found no impropriety in the trustee's action in this respect and further that the plaintiff's proportionate interest in the corporation was not debased. We agree and shall not discuss this point further.

On March 16, 1945, also during the administration of the trust, Elkay authorized the sale of thirty-five hundred shares of common stock at $10 per share, the par value. The issue was subscribed to in its entirety by Florence Katz, the wife of the trustee. Louis Katz executed a written release of the stock preemptive rights of the plaintiff so as to enable Florence Katz to purchase the entire issue.

On July 15, 1946, also during the administration of the trust, Elkay authorized the issue of one hundred sixty shares of common stock at $10 per share, the par value. This issue was subscribed to by Louis Katz, Florence Katz, Louis G. and/or Lucille Katz, and others.

The District Court pointed out that when the trust was created, plaintiff was given approximately an 8.2% equity interest in Elkay. The District Court said: "It is clear that he (Leopold Katz) intended that this interest should be kept substantially intact." The trustee argues that had he subscribed for additional common stock, he would have been embarking upon a speculative venture, and had the stock declined in value, the plaintiff would, undoubtedly, be making the claim that he should make good the loss.

■ We do not think there is anything in the trust agreement or in this record to justify the District Court's conclusion that Leopold Katz intended the 8.2% interest should be kept substantially intact for plaintiff. We find no evidence of intention either way.

However, the result reached by the District Court can be sustained under Illinois law.

In Merchants Loan & Trust Co. v. Northern Trust Co., 159 Ill.App. 45, affirmed 250 Ill. 86, 95 N.E. 59, 45 L.R.A., N.S., 411, the provisions of the will gave the trustee broad powers of investment. The Court said (250 Ill. 86, 90, 95 N.E. 59, 61): "It is apparent that the testator intended to give his trustee uncontrolled discretion in the management of the estate * * *."

In the Merchants Loan & Trust Co. case, part of the trust *res* consisted of shares of stock which had been owned by testator. Additional shares were issued in the same company, and the trustee acquired a pro rata number of such shares. The Court held this was proper and sanctioned by the trust investment statute (Hurd's Rev.St.1909, c. 140b; Ch. 148, § 32, Ill.Stats.): "Any trustee may continue to hold any investment received by him under the trust, or any increase thereof." The Appellate Court, at 159 Ill.App. 54, said: "In cases of this character and under circumstances ordinarily to be foreseen, the action of a trustee in fostering the investments made by the creator of the trust cannot be questioned as imprudent. A failure in this case of the trustee to have pursued the course which they did might have subjected them to severe criticism and have bordered very near to an inexcusable breach of duty."

A stronger case of breach of duty is made where, as in the instant case, the trustee's failure to buy stock for the trust beneficiaries resulted in a benefit to his wife, and thus, indirectly, to himself.

Although the market value of the shares in this closely held family corporation could not be established, it is clear the shares were worth much more than Mrs. Katz paid for them. On March 16, 1945, the day when the 3500 shares were issued, the book value of Elkay common stock was $34.00 per share. The share earnings for each of the five years pre-

ceding March 16, 1945, were approximately $8.00 per share. This is 80% of the par value of the stock. For each of the six years just prior to the issue, the dividends paid were $4.00 per share, or 40% of the par value of the stock. The gross and net income for the year 1944 was twice the gross and net income in 1943; the earned surplus at the beginning of 1945 was $121,511.00.

Mrs. Katz paid $10 per share for the entire 3500 shares. She should not be permitted to thus profit at the expense of the plaintiff. The District Court found that the failure of Louis Katz, the trustee, to purchase 8.2% of the stock issued on March 16, 1945 and on July 16, 1945, was a breach of trust. We agree. This phase of the District Court's decision is affirmed.

Affirmed in part, and reversed in part, and remanded for further proceedings not inconsistent with this opinion.

SCHNACKENBERG, Circuit Judge (concurring in part and dissenting in part).

I dissent as to Judge Duffy's holdings with reference to the following transactions as described in his opinion: Death Benefit to President's Widow, Salary to Wife of Board Chairman, and Alleged Excessive Executive Compensation. In all other respects I concur in Judge Duffy's opinion.

### Upon Petitions for Rehearing.

Before DUFFY, SCHNACKENBERG and KNOCH, Circuit Judges

DUFFY, Circuit Judge.

Marilyn D. Katz Santarelli, the plaintiff-appellant and cross-appellee herein petitions for a rehearing limited to that portion of the Court's opinion and decision under the heading: "Arthington Building." This petition will be denied.

Florence Katz, et al., the defendants-cross-appellants and defendants-appellees, petition for rehearing based upon several subjects covered by this Court's opinion.

### Diversion of Scrap Metal Assets.

Rehearing will be denied except the opinion of this Court may be considered modified to show that interest should be allowed on the amounts of said diversions, and defendants should return to the corporate treasury the penalties and interest charged to Elkay by the Internal Revenue Department.

### Leopold Katz Trust.

The decision of this Court with respect to the Leopold Katz trust will remain unchanged, and the petitions for rehearing with respect thereto will be denied.

### Arthington Building
### and
### Alleged Excessive Compensation.

Plaintiff-appellant asks that we direct the District Court upon remand to require restoration of the building and the income therefrom to Elkay. Our remand was for further proceedings not inconsistent with our opinion. The District Judge will enter a decree and judgment in the form he thinks proper and adequate without further specific directions from us. The same holds true as to subject "Alleged Executive Compensation."

### W. Russell Arrington.

The decision of this Court reversing the order of the District Court dismissing W. Russell Arrington as a party defendant, will remain unchanged.

### Appeal No. 12693.

The decree of the District Court which was reviewed by this Court in Appeals No. 12488 and No. 12489, was dated September 30, 1958. Thereafter, certain proceedings in accounting were heard by a Special Master. There was substantially no controversy as to the matters which resulted in the supplemental decree dated May 15, 1959. As a precaution, defendants-appellants appealed from said decree, which appeal was numbered No. 12693. The parties agreed that the record on the appeal in No. 12693 be considered with and as a part of appeal No. 12489. This Court has considered

the record in No. 12693 in disposing of the pending motions for rehearing. An order will be entered consolidating appeal No. 12693 with appeal No. 12489.

SCHNACKENBERG, Circuit Judge.

I have voted to grant that part of the petition for rehearing, dealing with "alleged excessive executive compensation".