**ALASKA PLASTICS, INC., an Alaska Corporation, Ralph R. Stefano, C. Harold Gillam, and Robert L. Crow, Appellants and Cross-Appellees,**

v.

**Patricia M. COPPOCK, Appellee and Cross-Appellant.**

**Nos. 4745, 4771.**

Supreme Court of Alaska.

Dec. 12, 1980.

Mary A. Nordale, Fairbanks, for appellants and cross-appellees.

Olof K. Hellen, Hellen & Partnow, Anchorage, for appellee and cross-appellant.

Before RABINOWITZ, C. J., CONNOR, BURKE, and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

CONNOR, Justice.

The issue in this case involves the rights of a minority shareholder in a close corporation who allegedly has been deprived of benefits accorded other shareholders. The trial judge concluded that the corporation was obligated to buy the minority shareholder's stock at its fair value. We have concluded that this remedy is not available on the present record as a matter of law.

Accordingly, we remand to the superior court to determine whether, based upon adequate findings of fact and conclusions of law, a remedy more appropriate to the alleged facts is available.

Those facts which the parties have stipulated to or which appear to be undisputed in the record are summarized below.

In 1961 the three individual appellants, Ralph Stefano, C. Harold Gillam, and Robert Crow formed a corporation known as Alaska Plastics and began to produce foam insulation at a building they bought in Fairbanks. Each of the three incorporators held 300 shares of stock. In 1970 Crow was divorced and, as part of a property settlement, gave his former wife, Patricia Muir, 150 shares or a one-sixth interest in the corporation.[1] From the time of incorporation until this lawsuit, Stefano, Gillam and Crow have been the only directors and officers of Alaska Plastics.

Stefano conceded at trial that the corporation forgot to notify Muir of annual shareholders meetings in 1971 and 1974. It was also undisputed that Muir was not notified of a shareholders meeting in 1972. According to Muir's testimony she was told of the 1973 shareholders meeting about three hours before the meeting was held.

In 1971 and 1972, Stefano, Gillam and Crow held the shareholders meetings in Seattle. It appears from Stefano's testimony that he and Gillam also brought their wives to these meetings at company expense, but he conceded that there was no business purpose for doing so.

In 1971, Stefano, Gillam and Crow voted themselves each a $3,000 annual director's fee. Although director's fees were apparently paid from 1971 through 1974, the three directors have never authorized Alaska Plastics to pay dividends. In 1974 the three board members also authorized an annual salary of $30,000 a year for Gillam, who was then employed as general manager of Alaska Plastics. Muir testified that she has never received any money from the corporation.

At the 1974 board meeting Stefano, Gillam and Crow also decided to offer Muir $15,000 for her shares and on May 1, 1974, Stefano wrote Muir informing her of the corporation's offer. Thinking the firm's offer was too low, Muir retained a lawyer who wrote the corporation expressing her concern both regarding the offered price and regarding the corporation's failure to inform Muir of shareholders meetings. In July, 1974, Muir's lawyer made a further demand on the corporation to inspect the books and records of the corporation. Gillam apparently advised Muir where the firm kept its books and told her they could be made available. An accountant employed by Muir did investigate the company's books and estimated that the shares might have a value somewhere between $23,000 and $40,000. Muir also ordered an appraisal of Alaska Plastics' Fairbanks property.

Later that same year, at a special director's meeting in October, 1974, the three board members agreed to make a $50,000 offer for Broadwater Industries, a firm located neat Palmer that made a type of plastic foam insulation similar to that produced by Alaska Plastics at their Fairbanks plant. The purchase was apparently accomplished at some time between October and the next shareholders meeting, which was held on April 25, 1975. Muir testified that she was never consulted about the purchase and first learned about it at the 1975 meeting. At that meeting, however, she did not dissent from a shareholder vote ratifying all the acts of the directors and officers for the previous year.

Broadwater Industries was subsequently renamed Valley Plastics and is now a wholly-owned subsidiary of Alaska Plastics. The directors and officers of Valley Plastics are Stefano, Gillam and Crow.

At the 1975 shareholders meeting, Muir offered her stock to the corporation for $40,000. In June, 1975, the board raised its offer to $20,000, which Muir again rejected.

1. At the time this action was filed Muir had remarried and assumed the name of Patricia Coppock. She has since that time resumed using her maiden name.

Shortly after these negotiations failed, Alaska Plastics' Fairbanks plant, which was not insured, burned to the ground. The fire caused a total loss. Since the fire, Alaska Plastics has ceased production from Fairbanks and the corporation has not made an attempt to resume production in Fairbanks. All the remaining manufacturing and sales of Alaska Plastics are accomplished through its subsidiary, Valley Plastics. The fire, in effect, turned Alaska Plastics into a holding company for its affiliate.

About a year after the fire, in 1976, Stefano, acting as an individual, made a further offer of $20,000 to Muir, but the purchase never took place. Further attempts by the parties to negotiate a purchase or settlement failed and a lawsuit was filed in October 1976.

An amended complaint alleges ten separate causes of action, and prays for relief both in the name of the corporation and individually for Muir. After trial, the case was submitted to an advisory jury [2] on two issues. The first issue was whether Stefano, when he acted as an individual, breached a contract to purchase Muir's shares. The jury found no contract. The second issue was whether the corporation's offer to buy Muir's shares was "equitable." The jury found that the corporation's offer of $15,000 in 1974 was not equitable, and determined that a fair offer would have been

$32,000. Following the jury's verdict, the trial judge issued a judgment which states in part:

> "[T]he continued retention by Plaintiff of one-sixth of the shares in Alaska Plastics, Inc. following the offer on April 1974 was oppressive to Plaintiff and ... an appropriate remedy would be to direct the transfer of Plaintiff's shares to Alaska Plastics, Inc. in exchange for a fair and equitable value...."

A total judgment was entered against the three individual appellants and Alaska Plastics for $52,314, which represented $32,000 for the value of the shares, $5,200 for attorney's fees, and $15,144 in interest and costs. Muir was in turn required to convey her shares to Alaska Plastics. Both sides subsequently filed appeals.

## I. SHAREHOLDER REMEDIES

In a corporation with publicly traded stock, dissatisfied shareholders can sell their stock on the market, recover their assets, and invest elsewhere. In a close corporation [3] there is not likely to be a ready market for the corporation's shares. The corporation itself, or one of the other individual shareholders of the corporation, who are likely to provide the only market, may not be interested in buying out another shareholder. If they are interested, majority shareholders who control operate policy are

---

**2.** Muir did not at first request a jury trial because, according to her motion in request of a jury trial, the issues appeared to be equitable in nature. After discovery, when there appeared to be legal relief available, the judge granted her request for a jury. The appellants later attempted to set aside the demand for a jury but this was refused. Although unclear from the record, it appears that this case may have begun as a conventional jury trial, but because by the close of trial it became apparent that equitable relief was appropriate, the court later considered the jury advisory in nature. In any event, the parties are in agreement that the jury was advisory only, and we will assume that this is the case.

**3.** In the leading case of *Donahue v. Rodd Electrotype Co., Inc.*, 367 Mass. 578, 328 N.E.2d 505, 511 (1975), the court suggested the following characteristics typified the close corporation:

> (1) a small number of stockholders;

> (2) no ready market for the corporate stock; and

> (3) substantial majority stockholder participation in the management, direction and operation of the corporation.

Delaware, like several other states, makes special statutory provisions applicable to close corporations, which the law defines as those corporations with no more than thirty stockholders, some restrictions on the transfer of stock and no public offerings. See Del.Code Ann. Title 8, § 342 (1975). *See generally* Note, 61 Cornell L.Rev. 986, 991–96 (1976). It is clear that under any of these definitions of a close corporation, Alaska Plastics qualifies.

The assumptions underlying a discrete treatment of closely held corporations have been recently questioned. *See* Fessler, *The Fate of Closely Held Business Associations: The Debatable Wisdom of "Incorporation"*, 13 U.C.Davis L.Rev. 473 (1980).

in a unique position to "squeeze out" a minority shareholder at an unreasonably low price.[4]

From a dissatisfied shareholder's point of view, the most successful remedy is likely to be a requirement that the corporation buy his or her shares at their fair value. Ordinarily, there are four ways in which this can occur. First, there may be a provision in the articles of incorporation or by-laws that provide for the purchase of shares by the corporation, contingent upon the occurrence of some event, such as the death of a shareholder or transfer of shares. Second, the shareholder may petition the court for involuntary dissolution of the corporation. Third, upon some significant change in corporate structure, such as a merger, the shareholder may demand a statutory right of appraisal. Finally, in some circumstances, a purchase may be justified as an equitable remedy upon a finding of a breach of a fiduciary duty between directors and shareholders and the corporation or other shareholders.

It does not appear from the record that there is any provision in the articles of incorporation or by-laws which would allow Muir to force Alaska Plastics to purchase her shares. Muir has not suggested that there is such provision, and we, therefore, do not consider the availability of this first method.

As to the second method, Alaska's corporation code provides in AS 10.05.540(2) that a shareholder may bring an action to liquidate the assets of a corporation upon a showing that "the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent. . . ." A shareholder may also seek liquidation when "corporate assets are being misapplied or wasted." AS 10.05.540(4). Upon a liquidation of assets all creditors and the cost of liquidation must be paid and the remainder distributed among all the shareholders "according to their respective rights and interests." AS 10.05.561. There is no indication whether Muir would have received more or less than the $32,000 price for her shares ordered by the court if Alaska Plastics. had been liquidated.

Liquidation is an extreme remedy. In a sense, forced dissolution allows minority shareholders to exercise retaliatory oppression against the majority. Absent compelling circumstances, courts often are reluctant to order involuntary dissolution. *E. g., Capitol Toyota v. Gervin*, 381 So.2d 1038, 1039 (Miss.1980); *Baker v. Commercial Body Builders, Inc.*, 264 Or. 614, 507 P.2d 387, 395–97 (1973); *Browning v. C&C Plywood Corp.*, 248 Or. 574, 434 P.2d 339, 343 (1967).[5] As a result, courts have recognized alternative remedies based upon their inherent equitable powers. Thus in *Baker*, interpreting a statute substantially similar to AS 10.05.540, the court authorized numerous alternative remedies for oppressive or fraudulent conduct by the majority. Among those would be:

> "an order requiring the corporation or a majority of its stockholders to purchase the stock of the minority shareholders at

---

4. For a discussion of some of the techniques that may be used to force a minority shareholder to sell out, see *Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 328 N.E.2d 505, 513 (1975), quoting F. H. O'Neal and J. Derwin, Expulsion or Oppression of Business Associates (1961) and Note, *Freezing Out Minority Shareholders*, 74 Harv.L.Rev. 1630, 1630–40 (1961). For notes discussing the refusal of a controlling group to declare dividends and the payment of excessive salaries, see Note, *Minority Shareholder Suits to Compel Declaration of Dividends*, 64 Harv.L.Rev. 299 (1950) and Note, *Executive Compensation in Close Corporations: The Need for a Modified Judicial Approach to the Reasonableness Test*, 1972 Duke L.J. 1251 (1972). Where disagreement among shareholders is so great that business effective-

ly cannot be conducted, some states provide for a "custodian" or "provisional director" remedy. See Note, *Custodian Remedy For Close Corporations*, 13 U.C.Davis L.Rev. 498 (1980).

5. However, courts in other jurisdictions have ordered dissolution of profitable, closely held corporations where there has been a breakdown in the relationship of shareholders. *See Application of Surchin*, 55 Misc.2d 888, 286 N.Y.S.2d 580 (N.Y.Sup.Ct.1967); *Application of Pivot Punch & Die Corp.*, 15 Misc.2d 713, 182 N.Y.S.2d 459 (N.Y.Sup.1959); Comment, *Dissolution Under the California's Corporations Code: A Remedy for Minority Shareholders*, 22 U.C.L.A.L.Rev. 595 (1975).

a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price." (footnote omitted). *Baker,* 507 P.2d at 396. The same court applied that remedy in *Delaney v. Georgia-Pacific Corp.,* 278 Or. 305, 564 P.2d 277, 288–89 (1977).

█ We are persuaded by *Baker* and conclude that Muir's request in her amended complaint for liquidation, although not actively pursued, could justify the trial court's order as an equitable remedy less drastic than liquidation. To prevail on this basis, Muir must establish on remand that the acts of Stefano, Gillam and Crow were "illegal, oppressive or fraudulent," AS 10.05.-540(2), or alternatively, constituted a waste or misapplication of corporate assets. AS 10.05.540(4). Because the trial court did not reach the issue, we express no opinion here on whether Muir has satisfied the statutory standards of AS 10.05.540.

█ The third method of forcing a corporation to purchase a minority shareholder's shares is a statutory appraisal remedy, which may be available under the Alaska Business Corporation Act in two circumstances where there is some fundamental corporate change. The remedy is available upon the merger or consolidation with another corporation, AS 10.05.417, or upon a sale of substantially all of the corporation's assets. AS 10.05.447. There is no suggestion that either statute is applicable in this case. In some circumstances, however, courts have found that a corporate transaction so fundamentally changes the nature of the business that there is a "de facto" merger which triggers the same statutory appraisal remedy.[6]

The possibility of a de facto merger was alleged in the plaintiff's complaint and the trial court considered it before instructing the jury, but concluded that it was not applicable. Muir's principal contention was that the acquisition of Valley Plastics

amounted to such a fundamental corporate change that she should have had an appraisal right.

In her cross-appeal, Muir did not assign the trial judge's dismissal of her de facto merger claim as error, nor has she argued it on appeal. Nevertheless, the remedy ordered by the trial judge is so similar to an appraisal remedy that we have examined the de facto merger doctrine more carefully because it might serve as an alternative ground for affirming the judgment of the trial court, *see Carlson v. State,* 598 P.2d 969, 973 (Alaska 1979); *Ransom v. Haner,* 362 P.2d 282, 285 (Alaska 1961).

In a frequently cited case, *Farris v. Glen Alden Corp.,* 393 Pa. 427, 143 A.2d 25 (1958), the Pennsylvania Supreme Court concluded that, under some circumstances, a shareholder should have an appraisal right even though the strict language of a statute might confine the remedy to a shareholder in the selling corporation only. Glen Alden, a Pennsylvania coal mining company, "bought" List Industries by issuing its own stock to List. List in turn distributed the Glen Alden stock to its shareholders, who traded their List stock for Glen Alden stock. As a result of the transaction, the former shareholders of List held over three-fourths of the outstanding shares of Glen Alden and controlled eleven of the seventeen directors. The court concluded that List was in reality the purchasing corporation and that the transaction should have been done in accordance with the statutory requirements for a merger.

Although we might follow *Farris* in an appropriate case, we do not believe the de facto merger doctrine is applicable here. Muir never objected to the transaction, as did the plaintiffs in *Farris.* In fact, at the 1975 shareholders meeting Muir voted to ratify the transaction. There is no indication that her stock holdings have been diluted,[7] her proportionate interest in Valley

6. For a discussion of the de facto merger doctrine, *see* Folk, *De Facto Mergers in Delaware: Hariton v. Arco Electronics, Inc.,* 49 Va.L.Rev. 1261 (1963).

7. Alaska Plastics apparently intended to offer the general manager of Valley Plastics a stock option, which might have diluted Muir's holdings, but there is no evidence in the record that the option was exercised.

Plastics is the same as her interest in Alaska Plastics. There has been no change in the Board of Directors or corporate officers. Alaska Plastics and Valley Plastics conducted the same type of business. The conversion of Alaska Plastics into a holding company had nothing to do with the purchase of Valley Plastics, but was a result of a fire that destroyed the Alaska Plastics plant. Both corporations have retained their separate corporate status. In short, the transaction here would have been little different had Alaska Plastics purchased any other major asset. Therefore, the judgment of the trial court cannot be affirmed on this alternative ground.

We turn, then, to the fourth possibility by which a minority shareholder may force a corporation to purchase his or her shares. Two leading cases have concluded that transactions by one group of shareholders that enable it to derive some special benefit not shared in common by all shareholders should be subject to close judicial scrutiny. The Massachusetts Supreme Judicial Court concluded that shareholders in closely held corporations owe one another a fiduciary duty:

> "Because of the fundamental resemblance of the close corporation to the partnership, the trust and confidence which are essential to this scale and manner of enterprise, and the inherent danger to minority interests in the close corporation, we hold that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another. In our previous decisions, we have defined the standard of duty owed by partners to one another as the 'utmost good faith and loyalty.' " (footnotes and citations omitted).

*Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 328 N.E.2d 505, 515 (1975). The California Supreme Court concluded that a controlling group of shareholders owes a similar duty to minority shareholders. In *Jones v. H. F. Ahmanson & Co.*, 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969), the court held that a control block of stock could not be used to give the majority benefits that were not shared with the minority.

We believe that *Donahue* and *Ahmanson* correctly state the law applicable to the relationship between shareholders in closely held corporations, or between those holding a controlling block of stock, and minority shareholders. We do not believe, though, that the existence and breach of a fiduciary duty among corporate shareholders supports the appraisal remedy ordered by the trial court in this case.

The trial judge made no findings of fact or conclusions of law, but the basis for his decision is clear from extensive discussions that took place prior to instructing the jury and the form of the judge's final order. The court concluded that once the corporation made an offer to Muir it was under an obligation to purchase her stock at a "fair" price, regardless of what price the corporation had initially offered. Had Muir actually sold the stock at an unfairly low price, she might have brought an action to set the transaction aside. The existence of a fiduciary duty between shareholders would justify careful scrutiny and shifting the burden onto the defendants to show that the transaction was fair. 13 W. Jaeger, Williston on Contracts § 1626A at 806–08 (3d ed. 1970). In this case, however, Muir rejected both of the corporation's offers. We are not aware of any authority which would allow a court to order specific performance on the basis of an unaccepted offer, particularly on terms totally different from those offered. Such a rule would place a court in the impossible position of making and enforcing contracts between unwilling parties.

*Donahue* and *Ahmanson* do suggest the appropriate form of a remedy in this case, however. In *Donahue*, one of the controlling shareholders caused the corporation to purchase forty-five of his shares, but then refused to buy an equal number of shares held by a minority shareholder. The court first noted the benefit that a shareholder in a close corporation gained by focusing the corporation to buy his shares.

"The benefits conferred by the purchase are twofold: (1) provision of a market for shares; (2) access to corporate assets for personal use. By definition, there is no ready market for shares of a close corporation. The purchase creates a market for shares which previously had been unmarketable. It transforms a previously illiquid investment into a liquid one." 328 N.E.2d at 518. The court then went on to conclude that where a controlling shareholder took advantage of such a special benefit, the fiduciary duty owed to other shareholders required that the corporation offer such a benefit equally:

"The rule of equal opportunity in stock purchases by close corporations provides equal access to these benefits for all stockholders."

*Id.* at 519.

In *Ahmanson*, the controlling group of shareholders transferred its control block of stock to a holding company which in turn offered its stock to the public. There were relatively few shares of stock in the active company in which the plaintiffs owned shares, and the price of each share was so high that they had little market appeal. The holding company, on the other hand, offered numerous shares at far lower prices. Because of the ready market for holding company shares, the controlling shareholders were able to sell part of their investment in the active company through the holding company at a huge profit. The court held that the majority shareholders had to offer this same opportunity to minority shareholders.[8]

As we read Muir's complaint, the essence of her action is that Stefano, Gillam and Crow enjoyed benefits from the corporation which should have been shared equally with her. None of the other shareholders of Alaska Plastics have sold their stock to the corporation so it would not be appropriate to order the corporation to purchase Muir's stock. Unlike *Donahue*, this was not one of the benefits which the majority received and which they did not share with Muir. There was evidence, however, that the corporation paid Stefano, Gillam and Crow "director's fees." Gillam received a substantial salary. The corporation apparently paid some of the personal expenses of the directors' wives. Regardless of how the corporation labels these expenditures, if they were not made for the reasonable value of services rendered to the corporation, some portion of these payments might be characterized as constructive dividends.

The analysis of such corporation payments is similar to the analysis of transactions to determine tax liability. Dividend distributions are not deductible by a corporation. Therefore, taxpayers in close corporations have made numerous attempts to structure transactions in a way which will allow a corporate deduction. Courts have not allowed the form of the transaction to prevent tax liability when the transaction is in substance a distribution of dividends. *See, e. g., American Properties, Inc. v. Commissioner,* 262 F.2d 150, 151 (9th Cir. 1958) (payments for taxpayer's speed boat a dividend); *Greenspon v. Commissioner,* 229 F.2d 947 (8th Cir. 1956) (payments for a "horticultural show place" not a corporate expense). We think a similar analysis should apply to payments which exclude some shareholders in a closely held corporation.[9] Such transactions should be examined to determine whether they are in fact a distribution of dividends, and if so the excluded shareholder must participate equally in the payments received by other shareholders.

We express no opinion as to whether Muir has shown that these payments were a

---

8. The court also concluded that there should have been an appraisal remedy because the transaction with the holding company amounted to a de facto merger. *Jones v. Ahmanson & Co.,* 1 Cal.3d 93, 81 Cal.Rptr. 592, 605–06, 460 P.2d 464, 477–78 (Cal.1969).

9. This type of analysis has been suggested in examining claims by minority shareholders that the majority shareholders who may be officers in the corporation are receiving excessive salaries. *See* Note, *Executive Compensation in Close Corporations: The Need for a Modified Judicial Approach to the Reasonableness Test,* 1972 Duke L.J. 1251, 1270–74 (1972).

distribution of dividends, whether she was deprived of other corporate benefits which she should have shared in equally with the other three shareholders, or whether the majority shareholders violated AS 10.05.540. The case must be remanded to the trial court to make appropriate findings of fact and conclusions of law based upon the present record.

## II. THE DERIVATIVE CLAIM

■ At the conclusion of trial, the judge dismissed Muir's derivative suit. In her brief, Muir suggests that a number of acts taken by the corporation amounted to a breach of the director's duty of care toward the corporation. For example, the directors failed to insure the Fairbanks plant, they kept large reserves of cash in noninterest-bearing checking accounts, and they loaned an employee money at a rate below prevailing rates of interest. Viewing the plaintiff's evidence alone, which amounted to little more than the fact that these acts had taken place, we conclude that the evidence was insufficient to establish a breach of duty towards the corporation.

■ Judges are not business experts, *Dodge v. Ford Motor Co.*, 204 Mich. 459, 170 N.W. 668, 684 (1919), a fact which has become expressed in the so-called "business judgment rule." The essence of that doctrine is that courts are reluctant to substitute their judgment for that of the board of directors unless the board's decisions are unreasonable. No *proof* was presented that the alleged acts were unreasonable in the sense that they would not have been taken by "an ordinarily prudent man ... in the management of his own affairs of like magnitude and importance." *Nanfito v. Tekseed Hybrid Co.*, 341 F.Supp. 240, 244

10. Muir has argued that the trial judge erred in not allowing her to discover certain notes prepared by an accountant. In her brief she stated that these notes were needed in order to present her derivative claim. Because we believe the trial court properly dismissed this claim, the issue is moot.

(D.Neb.1972). The proof offered was therefore insufficient to present a question for the trier of fact.

In *Santarelli v. Katz*, 270 F.2d 762 (7th Cir. 1959), the evidence showed that one of the director's wives in a closely held corporation had been receiving thousands of dollars a year to attend three or four conventions. In a stockholders derivative suit, the court noted:

> "[I]f a stockholder is being unjustly deprived of dividends that should be his, a court of equity will not permit management to cloak itself in the immunity of the business judgment rule."

*Id.* at 768.

There is thus authority for concluding that an unfair distribution of corporate funds would be a proper subject for a derivative suit. Nevertheless, as we read the gravamen of Muir's complaint, it is that she was harmed as an individual by not receiving the same benefits as the other shareholders received, not that the corporation itself was harmed. Therefore, we believe that a derivative action would not be the appropriate form of action in this case, *see Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 328 N.E.2d 505, 508 n.4 (1975). Furthermore, Muir's rights are adequately protected by an individual action. The trial court thus properly dismissed this claim.

The case is REMANDED to the superior court for further proceedings in accordance with this opinion.[10]

Both sides have contested the size of the award of attorney's fees. Inasmuch as the case must be remanded, it is not necessary to consider the issue.