*David S. Bontempo, Individually and on Behalf of Quotient, Inc. v. Clark J. Lare, et al.*
No. 55, September Term 2014

**Corporations – Dissolution Statute – Oppression of Minority Shareholder – Reasonable Expectations Doctrine**.   Under the Maryland General Corporation Law, a minority shareholder may seek dissolution of a corporation on the ground that those in control of the corporation have engaged in illegal, oppressive, or fraudulent conduct as to the minority shareholder.   Oppression is measured by the "reasonable expectations" of the minority shareholder at the time the shareholder obtained an interest in the corporation.
Maryland Code, Corporations & Associations Article, §3-413.

**Corporations – Dissolution Statute – Oppression of Minority Shareholder – Other Equitable Remedies**.   When a claim is brought by a minority shareholder under the Maryland General Corporation Law for dissolution of a corporation on the ground that those in control of the corporation have engaged in oppressive conduct as to the minority shareholder, a court may consider other equitable remedies less drastic than dissolution of the corporation, taking into account the interests of others associated with the corporation. A trial court's decision as to what, if any, equitable relief to grant is reviewed on appeal for abuse of discretion.   Employment-related relief, such as pay-related monetary damages or a requirement that the corporation employ the minority shareholder is unlikely to be appropriate, however, unless the oppressive conduct involved a breach of a written or oral employment agreement.

**Corporations – Fraudulent Conduct – Punitive Damages.**  Neither oppressive conduct as to a minority shareholder for purposes of the corporate dissolution provision of the Maryland General Corporation Law nor a breach of fiduciary duty as to the corporation by those in control of the corporation necessarily constitute fraudulent conduct entitling the minority shareholder to punitive damages.   A trial court's determination that conduct was not fraudulent will not be overturned unless clearly erroneous.

Circuit Court for Howard County
Case No. 13-C-10-081915
Argued: March 10, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 55

September Term, 2014

---

DAVID S. BONTEMPO, INDIVIDUALLY
AND ON BEHALF OF QUOTIENT, INC.

v.

CLARK J. LARE, et al.

---

Barbera, C.J.
*Harrell
Battaglia
Greene
Adkins
McDonald
Wilner, Alan J. (Retired,
    Specially Assigned)

JJ.

---

Opinion by McDonald, J.
Harrell and Adkins, JJ., dissent

---

Filed: August 6, 2015

*Harrell, J., now retired, participated in the hearing and conference of the case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Under the Maryland General Corporation Law,[1] a minority shareholder of a closely held corporation who has been "oppressed" by those who control the corporation may ask a court of equity to dissolve the corporation.  Many courts have measured oppression by looking to the "reasonable expectations" of minority shareholders at the time they join the venture.  The Court of Special Appeals is one of those courts,[2] and now by virtue of this decision, so are we.  Many courts in other jurisdictions – and the Court of Special Appeals, as well – have held that a court of equity may employ other equitable tools, short of dissolution, to remedy shareholder oppression.  By virtue of this decision, so do we.  This case requires us to consider the limit of those remedies when a minority shareholder, who also was an employee, seeks employment-related damages under the dissolution statute.

Petitioner David Bontempo, a minority shareholder in, and former employee of, Respondent Quotient, Inc., successfully proved in the trial court that he had been oppressed by Respondent Clark Lare, whose shares together with those owned by his wife Jodi Lare, also a Respondent, are the majority interest in Quotient.  While the trial court ordered an accounting and awarded Mr. Bontempo damages, unpaid corporate distributions, and attorneys' fees, it declined to dissolve Quotient, to require Quotient to reinstate Mr. Bontempo as an employee, or to award other employment-related relief.  In addition, the trial court was unpersuaded that the actions of Mr. Lare constituted fraudulent conduct meriting an award of punitive damages to Mr. Bontempo.

---

[1] Maryland Code, Corporations & Associations Article, §1-101 through §3-907.

[2] *Edenbaum v. Schwarcz-Osztreicherne,* 165 Md. App. 233, 885 A.2d 365 (2005).

We hold that the measuring stick for "oppression" of a minority shareholder – the shareholder's "reasonable expectations" upon becoming an owner of the company – does not dictate the nature of equitable relief (short of corporate dissolution) that a trial court must impose. In fashioning relief, the trial court may properly take account of the viability of the corporation, and the impact of the relief on others associated with the corporation, including other shareholders, management, employees, and customers. Employment-related relief, such as pay-related monetary damages or a requirement that the corporation employ the minority shareholder, is unlikely to be appropriate in the absence of a written or oral employment agreement. We hold that the trial court in this case did not abuse its discretion in deciding on appropriate relief.

## I

## Background

### A.    *Bontempo, the Lares, and Quotient*

*Formation of Quotient*

Mr. Bontempo and Mr. Lare worked together during the 1990s at Maxim Healthcare, a health care staffing company, in Chicago, Illinois. They shared the idea of running a business together. By the late 1990s, they had separately left Maxim and returned to the Baltimore-Washington area.

In 1999, Mr. Lare and his wife founded Quotient, a company that would recruit information technology professionals for placement as consultants at government entities and

private employers. Ms. Lare was, and remained, employed as a pharmacist at Watermont Pharmacy (which she owned with her mother). The Lares initially operated Quotient out of their home and funded it with their personal savings and credit cards. A Stockholders Agreement dated November 15, 2000 recited the ownership of the company's shares by the Lares. Among other things, the Agreement also designated certain "triggering events" that would require a shareholder to sell (to the corporation or to the remaining shareholders) the shareholder's interest. Among the triggering events was termination of the shareholder's employment with Quotient "for good cause."[3]

*Mr. Bontempo joins Quotient as an Employee and Shareholder*

Mr. Lare and Mr. Bontempo had stayed in touch, and Mr. Bontempo made a referral to Mr. Lare that resulted in a contract between Quotient and the United States Census Bureau. Soon thereafter, Mr. Bontempo himself joined Quotient as Vice-President of Business Development. Mr. Bontempo agreed to leave his $85,000 salary at another company to become a 45% shareholder in Quotient and draw a salary of $20,000 from the company beginning in February 2000. The parties did not enter into a written employment contract. It was understood that the Lares would continue to take no salary, and would adjust their ownership so that Mr. Lare owned 4% and Ms. Lare owned 51% of the shares (apparently an effort to qualify for government contracting preferences for woman-owned

---

[3] The Stockholders Agreement listed some examples of good cause: "theft from the Corporation, conviction of a felony, fraud on the Corporation."

and managed small businesses). The Circuit Court later found that the parties had essentially entered into a "handshake deal" under which Mr. Bontempo would join the company, but without an employment contract that set out any particulars of his employment.

In early 2001, the parties formalized the arrangement to a certain extent. In January 2001, the Lares and Mr. Bontempo executed an attachment to the Stockholders Agreement in which Mr. Bontempo assented to the terms of the earlier Agreement. Minutes of a contemporaneous board meeting stated that Mr. Lare had transferred stock to Mr. Bontempo "in recognition of his efforts on behalf of the Corporation since becoming an employee of the Corporation." Coincident with the transfer of shares to him in March 2001, Mr. Bontempo also signed a promissory note to Mr. Lare in the amount of $46,800 to be paid in installments over a five-year period. The parties later differed on the purpose of the note, although they agreed that it was related to the stock transfer. Mr. Bontempo testified that the note was never meant to be repaid, but was simply an "accounting record" and that he executed it for the company's books when he received his shares. Mr. Lare testified that Mr. Bontempo was expected to repay the note. It was undisputed that Mr. and Ms. Lare reported a capital gain as a result of the note and had paid approximately $12,000 in taxes on that gain. Mr. Bontempo never made a payment on the promissory note.

In December 2001, the Lares began to draw a salary from the company. Mr. Bontempo testified that he had an oral agreement with the Lares that his salary would match the Lares' combined salaries, once they started to take a salary, but the Lares contended that

there was no such agreement. The trial court found that there was not "a meeting of the minds" on this issue and that it was not part of any employment agreement. In fact, over the 10-year period that Mr. Bontempo spent as an employee of Quotient, Mr. and Ms. Lare's combined salaries roughly equaled Mr. Bontempo's salary for approximately four years, while the salaries were significantly different in both the early and later years of his employment.

In 2004, the Lares and Mr. Bontempo executed an Amended and Restated Stockholders Agreement (ARSA), which acknowledged Mr. Bontempo as a 45% owner, noted that he had owned the shares since 2001, and made other minor changes not relevant here. Mr. Bontempo had not contributed any capital to Quotient.

At first, both Mr. Bontempo and Mr. Lare focused on acquiring business for Quotient. As the company grew, Mr. Bontempo focused on sales and client relationships, and Mr. Lare focused on executive management and operations. At the time of trial in 2011, the parties agreed that Jodi Lare had not been involved in Quotient for four or five years.

The company eventually qualified for a General Services Administration ("GSA") schedule, which significantly improved its ability to obtain federal government contracts. The Circuit Court found that Mr. Bontempo had a critical role in obtaining certain government contracts for the company. The company added more employees, moved into its own office space, and relocated several times to accommodate its growth.

*Personal Expenses Paid by Quotient*

As Quotient grew, the company paid for various personal expenses for both the Lares and the Bontempos, including cell phones, vehicles, and automobile insurance. Quotient purchased a late model SUV and provided a cell phone and credit card for Mr. Bontempo's wife, who never had any role in the company. Both the Bontempos and the Lares used company credit cards for personal expenses, including gas, meals, and entertainment. Mr. Bontempo testified that he would reimburse the company for personal expenses if Mr. Lare asked him to do so.

Beginning in 2007, Mr. Lare approached Mr. Bontempo about making short-term interest-free loans to Watermont Pharmacy, the pharmacy where Jodi Lare worked and was part-owner. Mr. Bontempo approved those loans but, according to Mr. Bontempo, he was not aware that Quotient funds continued to be used for short-term loans to Watermont for several years beyond the loans he had approved. In 2006, the Lares placed their household employees on Quotient's payroll,[4] and company funds were used to pay for the Lares' personal trainers and personal legal fees (for a dispute not related to this litigation). Quotient also made short-term interest-free loans to Broadway Equities, LLC, a company formed by

_____

[4] Mr. Bontempo testified that he knew that Mr. Lare had considered placing his household employees on the company's health insurance policy, but he assumed that Mr. Lare would cover the cost of the health insurance, and did not know that the household employees would be included on Quotient's payroll. Testimony at trial established that the payments to the household employees were recorded in company records available to Mr. Bontempo and that other Quotient employees were aware of the payments.

Mr. Lare and his brother to purchase real estate in Cape May, New Jersey. The Circuit Court found that Quotient's financial statements did not reflect the loans.

In December 2007, the Lares borrowed more than $200,000 from Quotient in connection with a renovation of their home. The note that they provided to the company in connection with that loan was to be paid in full by March 1, 2009. But, instead of paying off the loan, they executed a new note on February 1, 2009, with a balance of nearly $500,000 due on January 1, 2016.[5]

*Mr. Bontempo's Departure*

What apparently began as an amicable collaboration between Mr. Lare and Mr. Bontempo deteriorated over time. Mr. Lare felt that he was shouldering more of the burden as the company grew and that Mr. Bontempo was spending too much time pursuing his interests in jazz and in a separate business with his brother. Following discussion with a management consultant, in June 2009, he cut Mr. Bontempo's salary. At the same time, Mr. Bontempo was concerned that the Lares were taking distributions as shareholders without notifying him or providing him with his proportionate distribution.

---

[5] The dissenting opinion recites several "facts" concerning the Lares' use of corporate funds not found by the trial court, but apparently derived from a report by Mr. Bontempo's forensic accountant. Dissenting Opinion at pp. 3-4 & nn.4, 6. At trial, the accountant was cross-examined at length about certain assumptions and decisions made in connection with that report, which likely explains why the trial court did not make the findings that the dissenting opinion would make on appeal.

By the fall of 2009, the relationship had soured significantly. In September 2009, Mr. Lare rejected a hiring suggestion made by Mr. Bontempo on the ground that the company did not have the funds to hire an additional business development employee (although Mr. Lare at the time was lending company funds to Watermont and Broadway Equities). Other disagreements about business strategy, salaries, shareholder distributions, and Mr. Bontempo's job performance came to a head. At a meeting in November 2009, Mr. Lare expressed his concerns about Mr. Bontempo's job performance and gave him a list of suggestions for improvement; Mr. Bontempo in turn raised his concerns about Mr. Lare's management of the company's finances.

At a later meeting in January 2010, they failed to reach agreement on salaries and distributions. Mr. Bontempo told Mr. Lare that they needed an "exit strategy" and suggested that they split the company. Mr. Lare urged Mr. Bontempo to let the Lares buy out his shares and to "name a price." Mr. Lare later gave Mr. Bontempo a proposal for a negotiated departure from the company which Mr. Bontempo rejected.

At a meeting on March 26, 2010, Mr. Lare proposed a separation agreement, which Mr. Bontempo again declined to consider and refused to sell his shares. In response, Mr. Lare fired him. At the time, Mr. Lare did not tell Mr. Bontempo that his employment was terminated for cause. Mr. Lare later testified that he fired Mr. Bontempo because of the latter's declining job performance, but several current and former Quotient employees testified at trial that Mr. Bontempo had remained a productive employee. The Circuit Court

8

found that Mr. Lare's testimony in this regard was not credible. In particular, the court found that Mr. Lare's claim that Mr. Bontempo's performance had declined and led to his termination for cause "strains credulity and is totally against the weight of the evidence."

Although Mr. Bontempo was no longer an employee of Quotient, he remained an officer, director, and shareholder of the company. Within a week of his firing, Mr. Bontempo revoked his personal guarantee of Quotient's financing at BB&T Bank. Shortly thereafter, he initiated this litigation. BB&T Bank declared that Quotient was in default for violation of the terms of its financing, based on Mr. Bontempo's revocation of his guarantee, his filing of this lawsuit, and Quotient's loans to Watermont and its shareholders. As a result, Quotient had to obtain a new financing source at a cost of $85,000 in additional finance charges.

In August 2010, Mr. Bontempo resigned from his position as an officer and director of Quotient because he felt disconnected from the daily operations of the company and believed that the board meetings were a "farce." We are advised that Mr. Bontempo still owns 45% of Quotient's shares. The Circuit Court found that throughout this litigation he has received proportionate distributions from the company.

After he left Quotient, Mr. Bontempo started a new company known as Siloquent LLC with his wife. He thereafter met with various contacts at clients of Quotient, but claimed that he was not soliciting business in competition with Quotient. Because Siloquent has not been

approved for a GSA schedule and Mr. Bontempo lacks a security clearance, Siloquent would have difficulty competing for Quotient's customers.

## B. *Bontempo versus the Lares and Quotient*

*Complaint and Pre-Trial Motions*

Mr. Bontempo filed this action in the Circuit Court for Howard County on April 2, 2010. The complaint was amended twice prior to trial. In its final iteration it included five counts, including two counts asserting direct claims against the Lares and Quotient, respectively, and three counts asserting derivative claims on behalf of Quotient against the Lares.[6]

*Direct claims*. Count One was a direct claim against the Lares under Maryland Code, Corporations & Associations ("CA"), §§3-413, seeking a panoply of equitable relief for Mr. Bontempo under that statute based on his status as a shareholder of Quotient and the alleged "illegal, fraudulent, and oppressive" conduct of the Lares with respect to him. Count Five was a direct claim against Quotient for breach of contract and sought compensatory damages for Mr. Bontempo related to unpaid salary and distributions based on his status as both an employee and a shareholder.

---

[6] The opinion of the Court of Special Appeals in this case contains an excellent summary of the remedies available under Maryland law to a minority shareholder in a Maryland corporation, including direct and derivative claims, which we will not repeat here. 217 Md. App. 81, 112-14, 90 A.3d 559 (2014).

*Derivative Claims on behalf of Quotient.* The three derivative claims sought various types of relief against the Lares based on alleged breaches of fiduciary duties owed to the corporation and the diversion of corporate funds for their personal purposes. Count Two asked the court to impose a constructive trust on the Lares for the benefit of Quotient with respect to funds improperly diverted from Quotient. Count Three asked the court to award compensatory and punitive damages against the Lares in favor of Quotient for the alleged breaches of fiduciary duty to the corporation and diversions of corporate funds. Count Four, labeled "Constructive Fraud," alleged that the Lares had acted with "fraud, actual malice, and an intent to injure Quotient" and sought compensatory and punitive damages on behalf of the corporation.

*Counterclaim.* Quotient counterclaimed against Mr. Bontempo, seeking a declaratory judgment that he had been fired for good cause, and thus was required to sell his stock to the company. It also sought damages for his alleged breach of fiduciary duties to Quotient.

Prior to trial the Circuit Court granted summary judgment in favor of the Lares individually with respect to employment-related damages sought by Mr. Bontempo in his direct claim based on CA §4-313 against them in Count One. It held that employment-based remedies were not available from a shareholder individually without a clear allegation of fraud committed by the shareholder. Mr. Bontempo potentially could still obtain such relief under his direct claim against the corporation in Count Five.

After some initial skirmishing as to whether the case should be heard by a jury, the parties agreed that the case should be tried before a judge alone.

*Trial*

Following a nine-day trial in March 2011, the Circuit Court issued an opinion that detailed its findings of fact and applied the law pertinent to the various counts to those facts.

With respect to Mr. Bontempo's direct claim under CA §3-413, the trial court looked to the "reasonable expectations" test articulated in *Edenbaum v. Schwarcz-Osztreicherne,* 165 Md. App. 233, 885 A.2d 365 (2005), to assess whether Mr. Bontempo, in his status as a minority shareholder, had been oppressed with respect to his investment in Quotient. In *Edenbaum*, the Court of Special Appeals explained:

> [A] minority shareholder who reasonably expects that ownership in the corporation would entitle him to a job, a share of the corporate earnings, and a place in corporate management would be "oppressed" ... when the majority seeks to defeat those expectations and there exists no effective means of salvaging the investment.

165 Md. App. at 258 (quoting *Balvik v. Sylvester*, 411 N.W.2d 383, 387 (N.D. 1987)..

Applying that standard, the Circuit Court found that:

> Bontempo's reasonable expectations were that this start-up company would employ him, that he would participate (as a stockholder) in the company's profit distributions and that he would not be terminated for subjective reasons. Bontempo was more than a mere employee of Quotient – he was, in all respects, a founding member of the company and made significant contributions to the company's later success.

12

The trial court found that Mr. Lare oppressed Mr. Bontempo by firing him for refusing to sell his shares, but the court found that the conduct did not involve fraud or illegality that warranted a dissolution of the company under the statute.

With respect to remedy, the Circuit Court explained that, under *Edenbaum*, dissolution should be avoided where less drastic remedies are available. The court observed that it was "patently obvious" that the parties would not be able to resolve their differences "without court direction and intervention" and concluded that reinstatement of Mr. Bontempo as an employee was not a viable remedy. But it also noted that the company was currently thriving and that, as a result of Mr. Bontempo's voluntary resignation, the current directors of Quotient were not divided. In the trial court's view, a more appropriate remedy for Mr. Lare's oppressive conduct was to order an accounting of the Lares' personal use of Quotient funds unrelated to Quotient's business purposes. The court also ordered reimbursement of a portion of Mr. Bontempo's legal fees and litigation expenses. Although Count One did not explicitly seek punitive damages, the court stated that, because it did not find fraud, it would deny any request for punitive damages under that count.

With respect to the derivative claims on behalf of Quotient, the trial court declined to order imposition of the constructive trust sought in Count Two, as it was unable to ascertain the amount misappropriated by the Lares until the completion of the accounting that it had ordered with respect to the Count One. With respect to Count Three, it entered judgment in favor of Quotient on the breach of fiduciary duty claim as to the Lares, but found that the

13

damages would be the same as those it awarded with respect to Count One. With respect to Count Four, the court found that Mr. Bontempo failed to meet the burden of proving that Mr. Lare's actions were fraudulent – as opposed to the product of mismanagement and poor judgment – and accordingly declined to award compensatory or punitive damages on that count.

With respect to the direct claim in Count Five against Quotient for breach of contract, the court held that Mr. Bontempo had not met his burden of showing that there was an agreement that his salary would equal the combined salaries of the Lares and declined to award salary-related damages to him. The court did find, however, that he was entitled to $118,000 in unpaid distributions from the corporation, and ruled that he was entitled to a proportionate share of future distributions as a shareholder.

Finally, the Circuit Court found that Quotient's counterclaim was without merit. Consistent with its other findings, the court determined that Mr. Bontempo was an at-will employee, but that he had not been fired for cause that would have triggered an obligation to sell his stock in Quotient. Accordingly, the court declined to issue the declaratory judgment requested by Quotient. In addition, it found that Quotient had not met its burden of proof that Mr. Bontempo had violated a fiduciary duty to the company in revoking his guarantee with its lenders.

*Post-Trial Motions and Rulings*

After the trial court issued its opinion, Mr. Bontempo filed a Motion to Alter or Amend Judgment asking the court to reverse its adverse rulings; he also made new requests for relief – among other things, that the court order: Jodi Lare to fire Clark Lare, the forced sale of the Lares' stock, and the reallocation of Quotient's contracts between Mr. Bontempo and the Lares under a court-appointed agent. Mr. Bontempo did not specifically ask that the judgment be modified to reinstate him as an employee of Quotient. The Lares and Quotient also filed a Motion to Alter or Amend Judgment, asking that the court clarify the order for an accounting of funds, modify the judgment to avoid double-counting damages, and eliminate the award of litigation costs.

After conducting a hearing at which it took additional evidence, the Circuit Court issued a detailed post-trial memorandum and order in May 2012 in which it reviewed and denied most of the relief sought by Mr. Bontempo. It reiterated that, while it had found oppressive conduct by Mr. Lare, it did not find that the Lares had defrauded Mr. Bontempo or Quotient. It reiterated its finding that Mr. Bontempo was an at-will employee of the corporation and noted that, although his employment had been terminated and he had voluntarily resigned from his positions as an officer and director, he remained a shareholder of the corporation. In denying Mr. Bontempo's request that it allocate Quotient's contracts between him and Mr. Lare as a way of dividing the corporate assets, the court also noted "the

15

undisputed testimony" that none of Mr. Bontempo's distributions had been withheld[7] and that nothing new had been presented during the post-trial hearing to change the court's previous conclusions. The court stated that Mr. Bontempo's "reasonable expectations" when he joined Quotient were "with the knowledge that he was a minority stockholder and an at-will employee," and that he had no expectation of "lifetime employment with the company." It thus rejected any additional employment-based relief. The court also denied all of Mr. Bontempo's renewed requests for additional equitable relief. It found that Quotient was a prospering company that did not need micromanagement, dissolution, or forced contract reallocation. Finally, the court held that Mr. Bontempo had relinquished his say in management decisions when he voluntarily resigned from his position as a director of the company.

In its post-trial order, the court also clarified that the accounting it required from the Lares related to Quotient payments for the Lares' household employees and personal litigation expenses. It directed that the accounting be completed by August 15, 2012, that the amount determined be regarded as a distribution to the Lares, and that Mr. Bontempo receive a proportionate distribution from Quotient. It reduced the figure for unpaid

---

[7] In his reply brief to us, Mr. Bontempo suggested that the company has subsequently failed to make appropriate distributions to him. As the Circuit Court will be conducting further proceedings on remand and as the information he refers to is outside the record of this appeal, we refrain from expressing any view on the merits of that contention in this opinion.

distributions in its previous order to more accurately reflect Mr. Bontempo's proportionate share of distributions.

Finally, the Circuit Court also vacated its prior award of attorneys' fees and expert witness fees in favor of Mr. Bontempo because it had not yet held a hearing on those awards. After holding a hearing, the court issued a supplemental memorandum opinion in which it ordered an award of attorneys' fees and costs in favor of Mr. Bontempo against Quotient with respect to the derivative claim on which he had prevailed (Count Three) under the "common fund doctrine," which allows a court to award attorneys' fees from a fund recovered as part of a successful derivative action.[8] The amount of that award, following correction of a computation error, was $109,012.76.

The Lares completed the required accounting of misappropriated funds. As of September 2012, Quotient had paid Mr. Bontempo $167,638 as damages for Mr. Lare's oppressive acts, $109,012.76 in attorneys' fees, and $81,818.18 in unpaid distributions.

*Appeal*

Mr. Bontempo appealed; Quotient and the Lares cross-appealed. The Court of Special Appeals, in a thorough and well-reasoned opinion, affirmed all but one of the trial court's rulings challenged on appeal. 217 Md. App. 81, 90 A.3d 559 (2014).[9] With respect to the

---

[8] *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

[9] The Court of Special Appeals also re-characterized one of the trial court's rulings. Although it did not quarrel with the substance of the ruling, the intermediate appellate court noted that, as a technical matter, the trial court's decision not to impose a constructive trust in favor of Quotient on funds held by the Lares should be regarded as a judgment in favor

trial court's order that Quotient treat the Lares' personal use of company money as a distribution, and make a proportionate distribution to Mr. Bontempo, the intermediate appellate court expressed the view that the payments made as a result of the accounting should recognize that Quotient exists as an entity separate from the Lares. Accordingly, it held that, because *Quotient* was the injured party with respect to the Lares' misuse of corporate funds, the monetary remedy should make Quotient whole. Once Quotient was made whole by the Lares, it would be up to the company to decide whether to make a distribution to its shareholders. 217 Md. App. at 126-30. Accordingly, the court vacated that portion of the trial court's judgment and remanded for further proceedings.[10]

---

of the Lares as against Quotient, rather than a judgment in favor of Quotient as against Mr. Bontempo. 217 Md. App. at 126 n. 23.

[10] The insistence by the Court of Special Appeals that the parties recognize the separate existence of Quotient and honor the corporate formalities also resolved an issue concerning the trial court's award of attorneys' fees and expenses to Mr. Bontempo. The Lares contended in their cross-appeal that the trial court had erred in relying on the common fund theory to award attorneys' fees and expenses to Mr. Bontempo with respect to his derivative claims on behalf of Quotient because the litigation had not resulted in the creation of a "common fund." The intermediate appellate court noted that repayment to Quotient by the Lares of the misappropriated corporate funds would result in a common fund belonging to the corporation. It remanded the issue to the Circuit Court to reconsider the award of attorneys' fees in light of the common fund that would be recovered. 217 Md. App. at 135-36.

The holding of the Court of Special Appeals in this regard is apt, as much of the misconduct in this case is attributable to the apparent inability of the parties to distinguish the corporation from its owners. It may be that the current board of Quotient can properly ratify the payments already made as a result of the accounting and that appropriate tax reporting and any other compliance issues can be resolved. But we are not in a position to provide advice on those subjects.

We granted Mr. Bontempo's petition for a writ of *certiorari* to consider two issues: (1) whether the Circuit Court erred in declining to order employment-related relief – *e.g.*, an order that Mr. Bontempo be re-employed by Quotient and be awarded back pay and a salary into the future – as part of the relief for the oppressive conduct it had found by one of the controlling shareholders of the corporation; and (2) whether the Circuit Court erred when it determined that the Lares had not engaged in "fraudulent" conduct.

## II

### Discussion

#### A.    *Standard of Review*

In an appeal of a bench trial, an appellate court will not disturb the trial court's findings of fact unless they are clearly erroneous, giving "due regard to the opportunity of the trial court to judge the credibility of the witnesses." Maryland Rule 8-131(c). Findings are not clearly erroneous if "any competent material evidence exists in support of the trial court's factual findings[.]" *Webb v. Nowak*, 433 Md. 666, 678, 72 A.3d 587 (2013); *Figgins v. Cochrane*, 403 Md. 392, 409, 942 A.2d 736 (2008). The appellate court considers questions of law without deference, or *de novo*. *See Breeding v. Koste*, 443 Md. 15, 27, 115 A.3d 106 (2015). A trial court's decision whether to award particular forms of equitable relief based on its fact findings and the applicable legal standards is reviewed for abuse of discretion. *Commission on Human Relations v. Talbot County Detention Center*, 370 Md. 115, 127, 803 A.2d 527 (2002).

## B. Shareholder Oppression and Employment - Related Relief

As noted above, the trial court found that Mr. Bontempo did not meet his burden of proof on Count Five to establish a breach of contract by Quotient with respect to his employment and found that he was an at-will employee of the company. Although he does not contest that ruling before us, Mr. Bontempo argues that his successful showing of oppressive conduct by Mr. Lare against him as a minority shareholder in his claim under CA §3-413 entitled him to employment-related relief with Quotient. His argument on appeal thus focuses on relief available under the corporate dissolution statute for oppression of a minority shareholder.

### At-Will Employment

There is a presumption in Maryland law that an employment relationship is "at-will" – *i.e.*, terminable by either party at any time, with or without cause. This Court recently referred to this presumption as "one of our most venerated common law precepts." *Spacesaver Systems, Inc. v. Adam*, 440 Md. 1, 11, 98 A.3d 264 (2014). Nothing in that doctrine, however, precludes parties from contracting otherwise, either by specifying a clear duration of employment or by spelling out reasons for termination, such as "just cause." 440 Md. at 12.

This Court recently examined how the owners of a closely held corporation might contract otherwise in *Spacesaver*. In that case, three siblings – a brother and two sisters – owned a company. Each also had an employment agreement with the company. When the

20

two sisters began to suspect their brother of stealing from the company, they had their respective employment agreements revised to include for-cause termination, including a list of examples of conduct that would constitute "cause." At the same time, each of the siblings' stock purchase agreements was similarly revised to provide that a shareholder could be forced to sell his or her shares to the company if the shareholder engaged in certain "prohibited acts" – a list that mirrored the examples of "cause" in the employment agreement. The brother soon resigned and voluntarily sold his shares to the company without any need to resort to the forced sale provision. The two sisters soon found themselves in conflict over their respective responsibilities and compensation at the company. Eventually one sister terminated the other, who then sued, alleging that her termination without cause violated her employment agreement.

To determine whether the terminated sister was an at-will employee, the Court looked to the language of the employment agreement. 440 Md. at 15. Relying on *Towson University v. Conte*, 384 Md. 68, 862 A.2d 941 (2004), a case concerning the employment status of a university president, the Court construed the "for cause" provision in the employment agreement to negate the notion that the sister was an at-will employee. 440 Md. at 16-17. This Court held that the shareholder's employment with her company in *Spacesaver* was "continuous for-cause" employment, based on the terms of the employment agreement. The Court emphasized that "the presumption for at-will employment persists and is only defeated when the parties explicitly negotiate and provide for a definite term of

21

employment or a clear for-cause provision." *Spacesaver*, 440 Md. at 25. While the Court

also referred to the list of "prohibited acts" in the stock purchase agreement, it was in the

context of interpreting the written employment agreement. There was no suggestion that the

stock purchase agreement itself provided for tenure for the sister as an employee.

*Oppression in a Closely-Held Corporation and its Remedy*

CA §3-413 provides for the involuntary dissolution of a Maryland corporation. That

statute states in relevant part:

> (b) ... any stockholder entitled to vote in the election of
> directors of a corporation may petition a court of equity to
> dissolve the corporation on grounds that:
>
> * * *
>
> (2) The acts of the directors or those in control
> of the corporation are illegal, oppressive, or fraudulent.

The statute does not define "oppressive" acts, although it is a term commonly used to

describe adverse treatment of minority shareholders in a closely-held corporation by those

who wield power within the company. *See, e.g.,* Black's Law Dictionary (9th ed. 2009) at

1203 (defining "oppression" as "[u]nfair treatment of minority shareholders (esp. in a close

corporation) by the directors or those in control of the corporation"). As the Circuit Court

noted, the Court of Special Appeals has embraced an approach adopted in a number of

jurisdictions that is known as the "reasonable expectations doctrine." Under that doctrine,

to determine whether a majority shareholder's misconduct vis-a-vis a minority shareholder

has been so severe as to trigger the possible demise of the corporation, a court measures that

22

conduct against the "reasonable expectations" of the minority shareholder when the minority

shareholder obtained his or her interest in the company. The intermediate appellate court has

elaborated:

> "Oppression" … has also been defined by one Maryland commentator as "conduct that substantially defeats the reasonable expectations of a stockholder." James J. Hanks, Jr. Maryland Corporation Law § 11.7(b) (1990, 2004 Supp.). Or, in the more precise terminology of one of our sister states, "conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise."

*Edenbaum,* 165 Md. App. at 256 (citations omitted).[11] The court clarified that the concept

of oppression is not measured solely by the subjective expectations or desires of the minority

shareholder: it "should be deemed to arise only when the majority conduct substantially

defeats expectations that, objectively viewed, were both reasonable under the circumstances

and were central to the [minority shareholder]'s decision to join the venture." *Id.* at 258

(quoting *Matter of Kemp & Beatley, Inc.*, 473 N.E.2d 1173, 1179 (N.Y. 1983)). In other

words, "disappointment alone should not necessarily be equated with oppression." *Id.*

*Edenbaum* involved a closely-held corporation that operated an adult care facility.

The majority shareholder, an experienced manager of assisted living facilities, was in charge

of admissions, hiring, billing, and administration of the facility. The minority shareholder

---

[11] Although Mr. Bontempo did not commit any capital to Quotient, presumably the "sweat equity" he invested in the company in its early years served the same purpose for application of the "reasonable expectations" doctrine.

was a geriatric nurse who provided patient care and house maintenance at the facility. The parties did not execute a separate employment agreement, but their shareholders agreement contained specific details about their respective job titles, responsibilities, and salaries. Under the agreement, the majority shareholder had the authority to make all business decisions for the corporation. After he became dissatisfied with the minority shareholder's operation of the facility, he terminated the employment of the minority shareholder, who then sued the majority shareholder and the corporation for breach of contract. The minority shareholder also sought dissolution of the corporation under CA §3-413, on the basis of "illegal, oppressive and/or fraudulent" conduct by the majority shareholder.

The corporation and majority shareholder contended that, insofar as the shareholders agreement spelled out the job descriptions, salaries, and work duties of the shareholders as employees of the facility, it functioned as an employment agreement – an argument that the Court of Special Appeals accepted while also noting that the agreement was "more modest in scope" as to their rights as shareholders. 165 Md. App. at 248. The trial court had found that the minority shareholder was properly discharged under that agreement. As the minority shareholder had not appealed that ruling, the Court of Special Appeals had no occasion to discuss whether she was an at-will employee. But the intermediate appellate court reversed the circuit court's decision that the minority shareholder was entitled to post-termination salary. The Court of Special Appeals held that, in her status as a minority shareholder, she

was not entitled to employment-related relief – *i.e.,* salary – as opposed to profits owing to the owners of the corporation. 165 Md. App. at 250-51.

Although the Court of Special Appeals held that the minority shareholder was not entitled to employment-related relief as a shareholder, the court held that she had been oppressed by the majority shareholder when her termination "defeated her reasonable expectations that she would be employed by the corporation, receive a salary, and take part in its management." *Id*. at 259. The court remanded the case to the circuit court to consider other possible equitable remedies. *Id.* at 261. Thus, the court looked to her expectation of employment with the company (together with her expected role in management) as a gauge for measuring oppression, even though it held that she was not entitled to employment-related relief in the form of a post-termination salary.

What remedy, then, is available to the minority shareholder in such a circumstance? The only remedy for oppressive conduct mentioned in the statute is dissolution of the corporation. CA §3-413. But the statute also refers to the court acting as a "court of equity," which indicates that the Legislature intended for a court to exercise its equitable powers in such a case.[12] In *Edenbaum*, the Court of Special Appeals observed that dissolution is an

---

[12] Courts in other jurisdictions have similarly recognized that a legislative provision authorizing the demise of a corporation would allow courts to fashion less drastic solutions. *See McCann v. McCann*, 275 P.3d 824, 833-34 (Idaho 2012); *Scott v. Trans-System, Inc.*, 64 P.3d 1, 9-10 (Wash. 2003); *Balvik v. Sylvester*, 411 N.W.2d 383, 388-89 (N.D. 1987); *Maddox v. Norman*, 669 P.2d 230 (Mont. 1983); *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 274-75 (Ak. 1980); *Masinter v. WEBCO Co.*, 262 S.E.2d 433, 438-39 (W.Va. 1980);

(continued...)

extreme remedy and should be avoided if less drastic equitable remedies are available.

*Edenbaum*, 165 Md. App. at 259-60. In its discussion of possible alternative remedies, it

listed a non-exhaustive set of alternatives to dissolution that might be appropriate in a

particular case:

> (a) The entry of an order requiring dissolution of the corporation at a specified future date, to become effective only in the event that the stockholders fail to resolve their differences prior to that date;
>
> (b) The appointment of a receiver, not for the purposes of dissolution, but to continue the operation of the corporation for the benefit of all the stockholders, both majority and minority, until differences are resolved or "oppressive" conduct ceases;
>
> (c) The appointment of a "special fiscal agent" to report to the court relating to the continued operation of the corporation, as a protection to its minority stockholders, and the retention of jurisdiction of the case by the court for that purpose;
>
> (d) The retention of jurisdiction of the case by the court for the protection of the minority stockholders without appointment of a receiver or "special fiscal agent";
>
> (e) The ordering of an accounting by the majority in control of the corporation for funds alleged to have been misappropriated;

---

[12] (...continued)
*Baker v. Commercial Body Builders, Inc.*, 507 P.2d 387, 394-96 (Or. 1973) (compiling a list of alternate remedies); *but see Ritchie v. Rupe*, 443 S.W.3d 856, 872-97 (Tex. 2014) (declining to interpret corporate statute to allow lesser remedies).

(f)     The issuance of an injunction to prohibit continuing acts of "oppressive" conduct and which may include the reduction of salaries or bonus payments found to be unjustified or excessive;

(g)     The ordering of affirmative relief by the required declaration of a dividend or a reduction and distribution of capital;

(h)     The ordering of affirmative relief by the entry of an order requiring the corporation or a majority of its stockholders to purchase the stock of the minority stockholders at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price;

(i)     The ordering of affirmative relief by the entry of an order permitting minority stockholders to purchase additional stock under conditions specified by the court;

(j)     An award of damages to minority stockholders as compensation for any injury suffered by them as the result of "oppressive" conduct by the majority in control of the corporation.

*Edenbaum*, 165 Md. App. at 260-61 (quoting *Baker v. Commercial Body Builders, Inc.*, 507 P.2d 387, 395-96 (Or. 1973)).  Notably, this list of alternative equitable remedies did not refer to employment-related relief, although the *Edenbaum* case itself arose out of a situation where a minority shareholder was an employee of the corporation.

A court acting under CA §3-413 to fashion a remedy less drastic than dissolution is not required to match its remedy to an expectation of the minority shareholder.  (Indeed, the default remedy – dissolution – may bear no correlation to any expectation of a shareholder.)  In particular, a court should take into account not only the reasonable expectations of the

27

oppressed minority shareholder, but also the expectations and interests of others associated with the company. Inherent in the notion that a court of equity may devise a remedy other than the statutory remedy invoked by the minority shareholder is that there are other interests at stake besides those of the oppressed or disaffected shareholder. The existence and operation of the corporation – an entity that is legally distinct from any of its owners – affects not only the complaining and controlling shareholders, but also many others who may be associated with or depend on the company – other shareholders, its management, employees, and customers. Dissolution – capital punishment for the corporation – affects those parties as well. For example, in *Edenbaum,* although the court found that reasonable expectations of the minority shareholder had been "defeated," it cited the fact that the company was an ongoing business and that the majority shareholder had not been found to have acted in bad faith when it upheld the decision not to dissolve the corporation and remanded for consideration of lesser equitable remedies. 165 Md. App. at 259, 261.

This Court has favorably alluded to the discussion of "oppression" and the reasonable expectations doctrine in *Edenbaum*, although we have not been called upon to apply it until this case. *See Boland v. Boland*, 423 Md. 296, 317-18, 31 A.3d 529 (2011) (quoting *Edenbaum* for a definition of oppression, but not reaching the merits of the oppression claim in the case before it). We agree with the Circuit Court and the Court of Special Appeals that the "reasonable expectations" doctrine is the test for oppressive conduct and that dissolution is not the only remedy if oppression is found. We proceed to the question before us –

whether an employment-related remedy was required as a result of the finding of oppression in this case.

*Analysis*

Mr. Bontempo does not claim that he had a lifetime employment contract or even continuous for-cause employment as in *Spacesaver*. It is undisputed that there was no written employment contract and no oral agreement as to specific terms of employment. To the extent that Mr. Bontempo asserted that there was agreement on key elements of his work with Quotient – *i.e.,* that his salary was to equal the combined salaries of the Lares, once they started to draw a salary – the trial court found otherwise. The trial court found that he was an at-will employee and, on this record, there is no basis to conclude that the finding is clearly erroneous.

Instead, Mr. Bontempo relies on the Circuit Court's findings, in determining whether there was oppression for purposes of the corporate dissolution statute, as to his reasonable expectations when he became a minority shareholder. He argues that the court's statement that he had a reasonable expectation of future employment at the time he became a shareholder superseded his at-will employment status. In essence, he would leverage the court's assessment of his expectations for purposes of the dissolution remedy into an employment-related remedy for a non-existent employment contract. Mr. Bontempo describes this as an equitable remedy that is only necessary when employment law does not adequately compensate someone in his position who has been fired without cause.

29

A "reasonable expectation" for purposes of the corporate dissolution statute is simply a way of detecting oppression, but it does not dictate the relief that an equity court is to grant. While Mr. Bontempo may have had a reasonable expectation of a future relationship with Quotient that included a connection to the corporation as an employee, officer, director, and shareholder, that is a far cry from an employment agreement that entitles him to a specific employment-related relief – *i.e.*, a specific position within the company with specific duties, pay, and conditions of employment. One might envision a situation in which a minority shareholder reasonably believed, upon committing capital to an entity, that one day he would advance to an executive position with the enterprise and in which, as a result of oppressive conduct of the majority shareholder, the minority shareholder has never been considered for any management position. A court acting under the authority of the corporate dissolution statute would be venturing far afield to order the company to hire the shareholder into a particular position with particular duties at a specified salary.

Even in circumstances where a shareholder has previously held a position with the company, as Mr. Bontempo did, reinstatement of Mr. Bontempo to a position with Quotient appears impractical and untenable. It is five years since his departure from the company. Because Mr. Bontempo can point to none of the detail that appeared in the shareholder's agreement in *Edenbaum*, reinstatement would be to an unspecified position with unknown duties at no specific pay scale (unless we are to find clearly erroneous the trial court's rejection of his contention that his salary was to equal the combined salaries of the Lares).

The trial court found that reinstatement of Mr. Bontempo was not a viable option as it found that he and Mr. Lare could not run a business together. Instead, the Circuit Court wisely sought, as *Edenbaum* suggested, to craft a remedy short of dissolution in light of the fact that Quotient appeared to be functioning well as business operation. Mr. Bontempo seems to agree, at least implicitly, that a reinstatement of employment with Quotient would not be a practical resolution. He did not include reinstatement in the laundry list of equitable relief he sought in his Motion to Alter or Amend Judgment in the trial court. In his briefs to this Court, he urges us to remand the case to the Circuit Court for an award of back pay and future payments of $225,000 per year "until this matter's final resolution," but does not mention reinstatement.[13] In essence, he asks that the court enhance the return he receives from his ownership interest by awarding pay-related damages that multiply the monetary award many fold without need for him to have performed any work.[14]

While Mr. Bontempo refrains from arguing that he was not an at-will employee or that he had an employment contract with Quotient – a difficult argument to make given the

---

[13] When pressed on the issue at oral argument, Mr. Bontempo's counsel stated that he was not suggesting that Mr. Bontempo was entitled to "reinstatement per se" as a result of the trial court's finding as to "reasonable expectations" under the corporate dissolution statute and that, in fact, reinstatement was "at the bottom of the menu" of the relief sought.

[14] The dissenting opinion "takes issue" with this description of Mr. Bontempo's request for monetary relief on the basis that a wrongfully discharged employee has an obligation to find other suitable employment and mitigate damages. Dissenting Opinion at p. 14 n.12. The dissenting opinion is correct that Mr. Bontempo would have an obligation to mitigate if he had been awarded such damages. What the dissenting opinion takes issue with is Mr. Bontempo's description of his request for monetary damages, which did not acknowledge an obligation to mitigate. See Petitioner's Brief at p. 30.

31

evidence at trial and the Circuit Court's findings – he seeks to convert it into a rationale for employment-related relief here. Indeed, he argues that, under *Edenbaum* "[e]quity allows recovery because of, not in spite of, the absence of an express employment contract." This seems quite a stretch. While the intermediate appellate court in *Edenbaum* endorsed the use of equitable remedies short of dissolution, it found that the detailed agreement concerning the terms and conditions of employment in that case *was* an employment agreement but, in remanding the case for further consideration of equitable relief, did not suggest employment-related relief as an option. Moreover, the Court of Special Appeals reversed the lower court's award of other employment-based relief of post-termination salary that had been based on the minority shareholder's status as a shareholder. The intermediate appellate court did not suggest that the circuit court could re-award that relief on remand.

Mr. Bontempo suggests that employment-related relief would be equitable because the ARSA - the Quotient amended stockholder agreement – refers to termination of shareholder-employees "for cause" in a provision that requires shareholders to sell their stock under particular circumstances. But the reference to a "for cause" termination in a forced sale provision of the ARSA is quite different from an employment agreement. When an owner-employee's job with the company is terminated for cause, it indicates such a rift among those in control of the company that a forced buy-out would likely be necessary to oust the terminated employee of his shares and preserve the ability of the corporation to operate. The fact that a buy-out is mandated when one of the owner-employees is terminated

32

for cause does not imply that an owner-employee may *only* be terminated for cause. It does mean that the forced buy-out is not triggered if the owner-employee is *not* terminated for cause. In this case, in ruling on Quotient's counterclaim, the Circuit Court found that he was not terminated for cause and, accordingly, he was not required to sell his shares.

The Circuit Court in this case appropriately considered the fact that Quotient was a thriving business, growing in the number of employees and contracts and that its majority shareholder – Jodi Lare – had not oppressed Mr. Bontempo, in deciding that dissolution was an inappropriate remedy for Mr. Lare's oppression. In fashioning a lesser remedy, the court acted well within its discretion when it decided not to require employment-related relief without an oral or written agreement to support that relief. To hold that the court abused its discretion and that Mr. Bontempo was entitled to employment-related relief – whether reinstatement or the monetary damages he is primarily interested in – would be to convert a discretionary equitable remedy into a substantive legal right.

## C. *Fraud and Constructive Fraud*

The second issue raised by Mr. Bontempo before us concerns his unsuccessful allegations of fraud in the Circuit Court. Those allegations appear in several places in the pleadings for different purposes. In his direct claim in Count One, brought under the corporate dissolution statute (CA §3-413), he alleged that the Lares had engaged in "illegal, oppressive, and fraudulent" conduct that triggered his right as a minority shareholder to seek dissolution of Quotient (or a less drastic equitable remedy). As noted above, the Circuit

33

Court found that Mr. Lare had oppressed Mr. Bontempo, but found that neither of the Lares had committed fraud as to him.

In two of the derivative counts of the complaint, Mr. Bontempo also alleged fraud and, on that basis, sought punitive damages from the Lares on behalf of Quotient. Count Three alleged breach of fiduciary duty by the Lares in the form of "fraudulent" actions. Count Four, labeled "Constructive Fraud," stated that the Lares' conduct "has been and continues to be marked by fraud." As noted above, the Circuit Court found that Mr. Lare (but again not Ms. Lare[15]) had breached his fiduciary duty to Quotient, but found that his conduct did not amount to fraud. It thus granted judgment in favor of Quotient on Count Three as to breach of fiduciary duty (but not Count Four as to constructive fraud) and declined to award punitive damages in favor of Quotient.

In his Motion to Alter or Amend Judgment, Mr. Bontempo asked the Circuit Court to award punitive damages to himself under CA §3-413 on Count One (the Second Amended Complaint had only mentioned *compensatory* damages for that cause of action[16]). In its

---

[15] Throughout his briefs, Mr. Bontempo refers to fraudulent conduct of "the Lares." He asserts that Mr. Lare acted "with Jodi Lare's actual or implied authority," and therefore Ms. Lare is also liable for his breach of fiduciary duty and fraud. However, Mr. Lare testified, and the Circuit Court found, that Jodi Lare had not been involved in the company for "four or five years" at the time of trial, and that Mr. Lare had "made the unilateral decision to utilize corporate funds for personal purposes." The Circuit Court's finding was not clearly erroneous. Therefore, we limit this discussion to Mr. Lare's conduct.

[16] As the Court of Special Appeals noted in its opinion in this case, the alternative remedies to dissolution under CA §3-413 listed in *Edenbaum*, which Count One of the complaint sought to invoke, did not include punitive damages. 217 Md. App. at 123.

detailed Memorandum Opinion on that motion, the Circuit Court reiterated its conclusion that Mr. Lare's conduct, while clearly "bad judgment," oppressive, and a breach of his fiduciary duty to the corporation, did not amount to fraud as to Mr. Bontempo or as to Quotient, and declined to make any award of punitive damages. The court explained:

> All of the transactions at issue were recorded on the books of the corporation and it is undisputed that Bontempo had access to those books and records. The Lares' household employee's names were recorded on the payroll records and several of the employees testified that they were aware of this and had never been told to not mention it to Bontempo. Some of the evidence presented was to the effect that Bontempo was not only aware of some of these improper transactions but had, in fact, given his approval for them.

> Based upon the extensive testimony and evidence presented at the trial, the Court found that although Clark Lare's actions were oppressive, they were not fraudulent. There was nothing new that was presented during the [post-trial] motions argument to convince the Court that the Plaintiff was defrauded. Bontempo failed to meet his burden of showing, by clear and convincing evidence, that a fraud was perpetrated upon him or Quotient.

The Court of Special Appeals reviewed the Circuit Court's analysis of the fraud allegations with respect to the direct claim and found "no clear error" in the trial court's finding of oppressive, but not fraudulent, conduct. 217 Md. App. At 124. With respect to the derivative counts, the intermediate appellate court noted that not every breach of fiduciary duty to a corporation is attributable to fraud and that the trial court was not clearly erroneous in finding one, but not the other, in this case. *Id*. at 130-31. After reviewing carefully the

35

record and the trial court's analysis, that court concluded that it found "no reason to second-guess the court's finding that the Lares did not commit fraud." *Id*. at 132. Neither do we.

Mr. Bontempo argues that the trial court used the wrong legal standards in its fraud, constructive fraud, and punitive damages rulings. With respect to the fraud and constructive fraud allegations, Mr. Bontempo needed to show concealment or deception – or at least the failure to disclose material information – on the part of the Lares. As the trial court noted, the self-dealing transactions were entered on Quotient's books, and Mr. Bontempo had access to those books. Several employees also knew about the transactions and were never told to conceal them from Mr. Bontempo. Mr. Bontempo argues that, in effect, Mr. Lare hid the self-dealing transactions from him in plain sight. We cannot say that the Circuit Court's factual findings were clearly erroneous, and on those facts the court was legally correct in finding that Mr. Bontempo did not prove fraud or constructive fraud.

With respect to the Circuit Court's decision not to award punitive damages to him, it is notable that this claim, first made in a post-trial motion, is based on the court's equitable power to award a remedy short of dissolution under CA §3-413. However, this Court has repeatedly held that an award of punitive damages is not available as an equitable remedy. *Kann v. Kann*, 344 Md. 689, 712, 690 A.2d 509 (1997) ("punitive damages are not at all available in equity"); *St. Luke Evangelical Lutheran Church, Inc. v. Smith*, 318 Md. 337, 348, 568 A.2d 35 (1990) ("a court of equity may not award punitive damages"). Nor would a finding of constructive fraud generally support an award of punitive damages. *See Ellerin*

36

*v. Fairfax Savings, F.S.B.*, 337 Md. 216, 236, 652 A.2d 1117 (1995) (identifying "constructive fraud" as a type of conduct that "falls short of the act of deliberate deception required for actual malice" and that does not support an award of punitive damages). Finally, the finder of fact – here, the Circuit Court – has discretion not to award punitive damages even when the underlying facts would support an award. *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 774-75, 752 A.2d 200 (2000); *Adams v. Coates*, 331 Md. 1, 15, 626 A.2d 36 (1993). There is no need to further explore those principles, because the trial court's finding as to fraud is not clearly erroneous and, accordingly, there was no predicate for a punitive damages award, in any event.[17]

## D. *Written Declaratory Judgment*

Finally, we address an issue not raised by the parties, but rather by the Court at oral argument – the absence of a written declaratory judgment. In its counterclaim, Quotient requested a declaratory judgment that Mr. Bontempo had been terminated for cause. As noted above, in its first memorandum opinion, the Circuit Court found that he had not been

---

[17] The dissenting opinion would remand to the Circuit Court for consideration of other equitable relief – some of which was not requested by Mr. Bontempo. Dissenting Opinion at pp. 19-20. The trial court gave careful consideration to the lengthy lists of remedies requested by Mr. Bontempo in his complaints and in his Motion to Alter or Amend Judgment. Moreover, as noted above, before us Mr. Bontempo primarily seeks monetary relief in the form of pay-related damages and punitive damages. While some of the dissent's suggested remedies – *e.g.*, re-defining excessive salaries as constructive dividends – might be appropriate to resolve a future controversy, there is no need for the trial court to revisit alternate equitable remedies for a third time on the current record.

terminated for cause and accordingly entered judgment against Quotient on the counterclaim. But the court did not issue a declaratory judgment in Mr. Bontempo's favor.

This Court has held that, when a party seeks a declaratory judgment, the court must issue one, even if it rejects the proposition advanced by the party seeking declaratory relief. That obligation has been succinctly stated as follows:

> ... when a declaratory judgment action is brought and the controversy is appropriate for resolution by declaratory judgment, the court must enter a declaratory judgment, defining the rights and obligations of the parties or the status of the thing in controversy, and that judgment must be in writing and in a separate document. That requirement is applicable even if the action is not decided in favor of the party seeking the declaratory judgment.

*Lovell Land, Inc. v. State Highway Admin.,* 408 Md. 242, 256, 969 A.2d 284, 292 (2009) (quotation marks and citations omitted). This defect does not affect our review of this case. This Court has explained: "The failure to enter a proper declaratory judgment is not a jurisdictional defect, however. This Court, in its discretion, may review the merits of the controversy and remand for entry of an appropriate declaratory judgment by the circuit court." *Id.* (quotation marks and citation omitted). On remand, the Circuit Court will be able to cure this defect by entering a brief declaratory judgment.[18]

---

[18] As to whether the failure to enter a separate declaratory judgment would render this appeal premature under the rule requiring that a final judgment be incorporated in a separate document to trigger the time to appeal, *see* Maryland Rule 2-601, that requirement may be waived when it does not mislead or prejudice a party and prevents the loss of a right to appeal. *See Hiob v. Progressive American Insurance*, 440 Md. 466, 475, 480, 103 A.3d 596 (2014). That is the case here.

# III

## Conclusion

As the Court of Special Appeals aptly observed "Overall, nobody is wholly pleased with the decision below, which in a complicated and heated case like this is usually a sign that the circuit court was on to something."[19] We agree. The Circuit Court ably handled a complex case, and on review of the particular issues before us – the finding of oppression but not of fraud, the equitable remedies selected, and the decision not to award employment-related relief or punitive damages – we find no error.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. CASE REMANDED TO THAT COURT TO REMAND THIS CASE TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR ENTRY OF A DECLARATORY JUDGMENT AND FOR OTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID ONE-HALF BY PETITIONER AND ONE-HALF BY RESPONDENTS CLARK LARE AND JODI LARE.**

---

[19] 217 Md. App. at 109.

Circuit Court for Howard County
Case No.: 13-C-10-81915
Argued: March 10, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 55
September Term, 2014

DAVID S. BONTEMPO, INDIVIDUALLY
AND ON BEHALF OF QUOTIENT, INC.

v.

CLARK J. LARE, et al.

Barbera, C.J.
*Harrell
Battaglia
Greene
Adkins
McDonald
Wilner, Alan M. (Retired,
        Specially Assigned),

JJ.

Dissenting Opinion by Adkins, J., which
Harrell, J., joins.

Filed: August 6, 2015

* Harrell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

"In all situations and under all circumstances, whether new or old, the principles of equity will point the way to justice where legal remedies are infirm." Joseph Story, 1 *Commentaries on Equity Jurisprudence as Administered in England and America* §4, at 5 (14th ed. 1918). Respectfully, I dissent because I think the Chancellor erred in failing to exercise her discretion in fashioning available equitable relief to remedy the oppression by the majority shareholders. The Chancellor erred in deducing there was "no legal basis" for Bontempo's claim that he is entitled to employment-based damages. Equally important, the Chancellor limited relief to a money judgement for past defalcations of a 55% shareholder, plus attorneys' fees, without considering how to provide any protection going forward. Bontempo requested various equitable remedies that would offer him protection against Respondents' continuing to funnel corporate earnings to their personal benefit. Although finding oppression, and defeat of Bontempo's reasonable expectations as a shareholder and employee, her memorandum opinions suggest she did not fully consider the alternative equitable remedies. I would vacate and remand for consideration of these equitable remedies, including damages for lost employment.

## FACTS

In 1999, husband and wife Clark and Jodi Lare formed Quotient, Inc. ("Quotient"), an information technology services company focused on fulfilling government and private contracts. In an effort to gain favor in obtaining government contracts as a majority female-owned company, Clark Lare owned a 49% share of the company, and Jodi owned the remaining 51% of the shares. While Quotient was still in its infancy, Clark Lare invited his former coworker, David Bontempo, to join the firm as a minority shareholder and

employee.  Pursuant to the amended shareholders' agreement, executed in 2000, Bontempo owned 45% of the company, Clark Lare owned 4%, and Jodi Lare retained her 51% interest.  They never reduced an employment agreement to writing.

Over the years, Quotient grew, eventually obtaining a General Services Administration schedule.[1]  As a result of Quotient's success,[2] the three owners enjoyed larger salaries and corporate perks, including having Quotient pay for cell phone and credit card expenses, automobiles, and personal physical trainers.

But the Lares went further in their use of corporate assets for personal use, brazenly treating Quotient funds as if they resided in their own personal bank accounts.[3]  Beginning in 2006, they used corporate funds to pay household employees and personal legal fees.  The household employee expenses were disguised in Quotient's books and on its financial statements as "general and administrative expenses."  Bontempo testified that

---

[1] The United States General Services Administration "establishes long-term governmentwide contracts with commercial firms to provide access to millions of commercial products and services at volume discount pricing."  GSA Schedules, http://www.gsa.gov/portal/content/197989 (last visited July 16, 2015).

[2] Quotient secured lucrative contracts with a number of large public and private entities, including: "the United States Census Bureau, Lockheed Martin Corporation, the Internal Revenue Service, the United States Patent and Trademark Office, the Maryland Department of Education, the Smithsonian Institution, the National Library of Medicine and the Clinical Center (each a division of the National Institutes of Health), AARP, the United States Department of Homeland Security, the University of Maryland Medical Systems, and TAJ Technologies, Inc."  *Bontempo v. Lare*, 217 Md. App. 81, 94 n.6, 90 A.3d 559, 566 n.6 (2014).

[3] "Although Ms. Lare was Quotient's majority shareholder, she had little to no role in Quotient's business.  When the circuit court used the term 'Lare' in the singular, it referred to Mr. Lare."  *Id.* 93 n.5, 90 A.3d at 566 n.5.  Henceforth, for this reason, "Lare" shall refer to Clark Lare.

2

notwithstanding his position as a 45% shareholder, Lare never asked Bontempo for permission to use Quotient funds for these expenses.[4]

The Lares also advanced loans to themselves[5]—some of them interest-free loans to separate companies they owned and in which Quotient had no ownership interest. The Expert Witness Report prepared by a forensic accountant hired by Bontempo during this litigation found that between 2001 and May 2010, Quotient loaned approximately $1,204,000 to these companies on an unsecured basis.[6] Bontempo testified that there was no legitimate business purpose for any of these loans. He also testified that Lare never asked for his permission to make these loans.

Not only did the Lares use Quotients funds for personal expenses without Bontempo's knowledge or authorization, but also these transactions rarely, if ever,

---

[4] A forensic accountant hired by Bontempo reported that Lare also used Quotient funds to pay for the following personal expenses:
- $67,000 for antiques
- $75,000 for home remodeling
- $3,599 for fitness equipment

[5] In December 2007, Lare placed a strain on Quotient's liquidity when he borrowed $205,586 from Quotient to pay expenses related to a home remodel and difficulties the Lares were having with the contractors they hired. Although the note was to be paid in full by March 2009, Lare instead executed another note in February 2009 in the amount of $497,267, with the balance due in January 2016. Lare's year-end loan balances between 2006 and 2009 were as high as $556,564, and Bontempo testified that the Lares borrowed "well in excess of a [m]illion dollars" from Quotient. Although Bontempo authorized at least one of the loans to Lare, he testified that Lare ignored the terms of the promissory note. Bontempo also testified that Lare "had the habit of taking money out of the company" and "all of the sudden" deciding to "just create a loan for it."

[6] The forensic accountant also identified a number of disbursements from Quotient to a separate company in which Jodi Lare owned a 60% interest that appeared to have no business purpose but were nevertheless charged to Quotient expense accounts.

3

appeared on Quotient's financial statements. What is more, despite significant sums being diverted to these personal uses, Lare rejected Bontempo's request that they hire a new business development employee, "claiming that Quotient did not have the funds" to do so.

Bontempo and Lare's relationship first began to crumble in 2007, when—Bontempo alleged—Clark Lare took a $100,000 distribution and asked Bontempo to wait until the end of the year to take his own distribution. But when Lare converted his distribution to a loan, Quotient was no longer compelled to make an equivalent distribution to Bontempo. Bontempo alleged similar behavior in 2008 and 2009, and also a salary imbalance[7] between the two men. Conversely, Lare blamed Bontempo's poor job performance for the strained relationship and asserted he reduced Bontempo's salary in an effort to motivate him.

At a meeting in November 2009, Lare raised the issue of Bontempo's performance. In January 2010, the two met again—this time to discuss their salaries and distributions. At this meeting, Bontempo suggested they create an exit strategy, proposing that they split the company. Lare refused and informed Bontempo that he should sell his stock back.

In March 2010, after Lare provided Bontempo with a separation agreement that Bontempo refused to sign, Lare informed Bontempo that he was being terminated. At this time, Bontempo received no indication that his termination was for cause. At trial, Lare contended that the termination was a result of poor job performance.

---

[7] Bontempo asserted—and the Circuit Court rejected—that the parties orally agreed that he would draw a salary equal to the combined salaries of Clark and Jodi Lare.

4

**Litigation**

Bontempo filed a Complaint in the Circuit Court for Howard County seeking relief pursuant to Maryland Code (1975, 2007 Repl. Vol.), §§ 3-413 and 3-414 of the Corporations and Associations Article ("CA"), which provide for involuntary dissolution and the appointment of a receiver, respectively. In response, Quotient and the Lares filed a counterclaim, seeking a declaratory judgment that Quotient terminated Bontempo for good cause and that Bontempo must resell his stock to Quotient, and seeking to hold Bontempo liable for breaching his fiduciary duties to Quotient. Bontempo filed two amended complaints that alleged new counts, and Quotient and the Lares responded with counterclaims.[8] Bontempo brought suit both personally and derivatively on behalf of Quotient, naming the Lares and Quotient as defendants. On cross-motions for summary judgment, the Circuit Court dismissed Bontempo's request for employment-based remedies from the Lares personally.

The Chancellor held a nine-day bench trial, resulting in three memorandum opinions and four orders. In its first opinion, entered September 29, 2011, the court found that "[t]here was substantial and credible evidence . . . establishing that Bontempo joined Quotient . . . with the express intention of playing a substantial part in the company's

---

[8] In his First Amended Complaint, Bontempo added claims for constructive trust, breach of fiduciary duty, and constructive fraud. In his Second Amended Complaint, he added a claim for breach of contract. Thus, his Second Amended Complaint—the operative complaint in this litigation—contained five counts: Involuntary Dissolution (Count I); Constructive Trust (Count II); Breach of Fiduciary Duty (Count III); Constructive Fraud (Count IV); and Breach of Contract (Count V).

5

growth and financial success." In spite of Bontempo being a "responsible and dedicated employee," he was terminated without cause. The trial court opined:

> Lare's actions were oppressive, particularly as they related to the credible testimony that Bontempo would be fired if he did not voluntarily resign and sell his shares of Quotient stock. Bontempo's reasonable expectations were that this start-up company would employ him, that he would participate (as a stockholder) in the company's profit distributions and that he would not be terminated for subjective reasons.

The court found "Bontempo's expectations to be objectively reasonable," including "that he would be an owner of the company, work for the company and would have a role in the company as long as he was a stockholder." The court also concluded that Lare's actions were oppressive because "[t]here [was] no support for Lare's position that Bontempo was well aware of—and approved—the multitude of transactions" in which Lare misused corporate funds for his personal benefit.

Ruling that dissolution was too drastic a remedy, the Chancellor considered the equitable remedies "available to it under *Edenbaum* [*v. Schwarcz-Osztreicherne*, 165 Md. App. 233, 885 A.2d 365 (2005)]." It ordered an accounting of all misappropriated funds and reimbursement of legal and expert witness fees incurred by Bontempo.[9] But despite finding Lare's conduct regarding Bontempo's "reasonable expectations . . . that he would

---

[9] Additionally, in its first memorandum opinion, the Circuit Court declined to order a constructive trust and ruled in favor of Bontempo—on behalf of Quotient—on the breach of fiduciary duty claim but not on his constructive fraud claim. It ruled against Bontempo in his claim seeking damages for the unequal salaries between him and the Lares but awarded him damages for the distributions to which he was entitled. Lastly, the court denied Quotient's request for a declaratory judgment that Bontempo was fired for cause and its claim against Bontempo for breach of fiduciary duty.

not be terminated for subjective reasons" oppressive, the trial court failed to address how Bontempo's loss of employment should be remedied.

Following the Chancellor's initial decision, the parties filed cross-motions to alter or amend the judgment. In his motion, Bontempo urged the court to grant additional relief, arguing that the original decision did not grant sufficient relief to protect his interests. He asked the court to grant various forms of broad equitable relief.[10] Bontempo contended that "none of the items of monetary relief awarded by the [Circuit] Court address[ed] his

---

[10] These were as follows:

[a] Appoint an agent to supervise, and to report to the Court, concerning a Court-ordered allocation of Quotient's accounts and other assets on a 55/45 basis, with the Court retaining equitable jurisdiction to grant further relief at a later date or, alternatively direct the Lares to sell their stock to Bontempo under the provisions of the Amended and Restated Stockholders Agreement . . . .

[b] Establish accounting procedures.

[c] Allocate certain Quotient . . . contracts to Bontempo as a subcontractor to Quotient.

[d] Award Bontempo the salary he has not received since March 2010, in an amount equal to the combined salaries of Clark Lare and Jodi Lare.

[e] Award Bontempo additional attorneys' fees and litigation expenses.

[f] Make a finding of fraud and award Bontempo punitive damages.

[g] Require Jodi Lare (majority shareholder) to terminate Clark Lare (minority shareholder) for cause.

[h] Impose personal liability on Clark Lare and Jodi Lare for the damages the Court awarded to Bontempo under Count I of the Second Amended Complaint.

[i] Impos[e] a constructive trust.

[j] Make a finding of constructive fraud.

[k] Award other various forms of short term relief.

7

objectively reasonable expectation that he would remain employed as a 45% owner, director, officer and employee of Quotient."

Regarding Bontempo's request for damages from lost salary arising out of his termination, the court reasoned:

> The court found that Bontempo was an at-will employee, and as such, could be terminated at any time for any reason. In spite of those findings, Bontempo requests that the Court award him back-pay since March 26, 2010 in the annual amount of $225,000. **The Court finds that no legal basis exists for Bontempo's claim that he is entitled to employment-based damages for the Lares' breaches of their fiduciary duties**.
>
> * * *
>
> There is no dispute that Bontempo received salary, bonus and distribution income from Quotient for a significant period of time. **Although he had reasonable expectations when he took the risk to join Quotient more than ten (10) years ago, it was with the knowledge that he was a minority stockholder and an at-will employee**. **It would be unreasonable to assume that his expectancy interests included lifetime employment with the company.** Although he was terminated and the Court found that Clark Lare's actions were oppressive, the facts do not support Bontempo's receipt of salary and bonus monies after the cessation of his employment with Quotient.

(Emphasis added.) To further bolster its conclusion that the equitable remedies provided would redress Bontempo's injury, the Circuit Court highlighted that Bontempo "continues to receive his share of stockholder distributions, none of which have ever been withheld. As long as the company remains viable and profitable, Bontempo will continue to receive distributions by virtue of being a stockholder." In light of the past actions of the Lares, the reliability of this assumption by the Chancellor going forward is questionable.

8

**Equitable Relief For Shareholder-Employee Under CA § 3-413**

CA § 3-413 permits a court to consider other remedies short of dissolution when crafting equitable relief to rectify a majority shareholder's oppressive conduct in a close corporation. *Edenbaum*, 165 Md. App. at 261, 885 A.2d at 380. In *Edenbaum*, the Court of Special Appeals applied the reasonable expectations view of oppressive conduct. *Id.* at 259, 885 A.2d at 379. Relying on the reasoning of the Court of Appeals of New York, our intermediate appellate court stated that "oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the venture." *Id.* at 258, 885 A.2d at 379 (quoting *Matter of Kemp & Beatley, Inc.*, 64 N.Y.2d 63, 73, 473 N.E.2d 1173, 1179 (1984)) (internal quotation marks omitted). The Court of Special Appeals also relied on *Balvik v. Sylvester*, a case from the Supreme Court of North Dakota, for the proposition that "a minority shareholder who reasonably expects that ownership in the corporation would entitle him to a job, a share of the corporate earnings, and a place in corporate management would be 'oppressed' in a very real sense . . . when the majority seeks to defeat those expectations and there exists no effective means of salvaging the investment." *Id.* (quoting *Balvik v. Sylvester*, 411 N.W.2d 383, 387 (N.D. 1987)) (internal quotation marks omitted). I agree with the guidance offered by our sister states and embraced by the Court of Special Appeals.

The Lares do not dispute at this juncture of this litigation that there was oppression. The Chancellor found that

9

> Lare's actions were oppressive, particularly as they related to the credible testimony that Bontempo would be fired if he did not voluntarily resign and sell his shares of Quotient stock. Bontempo's reasonable expectations were that this start-up company would employ him, that he would participate (as a stockholder) in the company's profit distributions and that he would not be terminated for subjective reasons. Bontempo was more than a mere employee of Quotient—he was, in all respects, a founding member of the company and made significant contributions to the company's later successes.

Although the Circuit Court found that "Bontempo's reasonable expectations were that [Quotient] would employ him, that he would participate (as a stockholder) in the company's profit distributions and that he would not be terminated for subjective reasons," its judgment provided no relief to Bontempo other than a money judgment for corporate funds misappropriated in the past by the majority shareholders and reimbursement for attorneys' fees and litigation expenses. When a court makes a finding of oppressive conduct (as was done here), *Edenbaum* teaches that the proper course of action for a trial judge in formulating appropriate relief (especially where requested to consider such), is to grant equitable relief to correct the wrongs found to have occurred. *See Edenbaum*, 165 Md. App. at 260, 261, 885 A.2d at 380, 381 (remanding for consideration of equitable remedies when minority shareholder's employment was terminated, frustrating her reasonable expectations); *Balvik*, 411 N.W.2d at 388, 389 (remanding for consideration of equitable remedies short of dissolution when minority shareholder's employment terminated); *McCauley v. Tom McCauley & Son, Inc.*, 104 N.M. 523, 527, 532, 724 P.2d 232, 236, 241 (1986) (affirming equitable remedies granted to minority shareholder who was ousted from membership on board of directors, removed from her office as Secretary-

10

Treasurer, and denied personal benefits authorized for other shareholders); *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 275, 278 (Alaska 1980) (remanding for consideration of equitable remedies less drastic than dissolution when minority shareholder was allegedly denied benefits accorded to other shareholders).

Here, the Chancellor—sensing some tension between the equitable relief available under CA § 3-413 and the doctrine of at will employment—elected not to test those waters. In doing so, the Chancellor believed that she could not award damages for loss of employment as a matter of law. I submit that this decision was an error of law, even though not necessarily one a conscientious judge could have foreseen. The at-will employment doctrine—a creature of employment law—does not necessarily erase Bontempo's reasonable expectations as a shareholder that he be employed absent reason to terminate him. The at-will doctrine and reasonable expectations have been seen as distinct areas of law which authorize different sources of relief. The reasoning of the Court of Appeals of Minnesota is instructive on this point:

> **The doctrine of employment-based shareholder oppression is distinct from the wrongful-termination doctrine**, and the analysis under the separate doctrines should attempt to protect close-corporation employment and, at the same time, respect the legitimate sphere of the at-will rule.
>
> **The wrongful-termination doctrine affords discharged employees of *all* corporations a remedy in the form of wages and/or reinstatement, regardless of whether they are also shareholders**, if they can establish the existence of an express or an implied contractual agreement or a promise inducing reliance. The threshold question in wrongful-termination cases, therefore, is whether a contractual agreement or a promise inducing reliance existed.

11

> **The oppression doctrine, on the other hand, affords closely-held-corporation shareholders relief when the controlling shareholders frustrate their reasonable expectations as shareholder-employees**. Accordingly, the threshold question in the context of a claim of shareholder oppression based on the termination of employment is whether a minority shareholder's expectation of continuing employment is reasonable.

*Gunderson v. Alliance of Computer Prof'ls, Inc.*, 628 N.W.2d 173, 190 (Minn. Ct. App. 2001) (emphasis added) (internal citations omitted). The source of Bontempo's claim lies not in a written or oral contract between Bontempo and Quotient but in the oppression of his reasonable expectations as a shareholder in a close corporation whose primary return on investment was his employment. *See Kortum v. Johnson*, 755 N.W.2d 432, 440–41 (N.D. 2008) ("Even though Kortum was an at-will employee, and therefore could be terminated with or without cause, the termination of her employment triggers an inquiry into whether the Corporation acted in a manner unfairly prejudicial toward Kortum in her capacity as a shareholder-employee." (citing *Gunderson*, 628 N.W.2d at 190)); *Hayes v. Olmsted & Assocs.*, 173 Or. App. 259, 266, 21 P.3d 178, 182 (2001) ("The 'squeeze-out' tactics of majority shareholders often deprive minority shareholders of management participation, employment income or other advantages that they reasonably have come to expect, and which are the essential benefits of their investment."); *Bonavita v. Corbo*, 300 N.J. Super. 179, 197, 692 A.2d 119, 128 (1996) (ordering a buy-out of oppressed shareholder's stock because "[a] shareholder who reasonably expected that ownership in the corporation would entitle him or her to a job, a share of corporate earnings, a place in corporate management, or some other form of security, would be oppressed in a very real

sense when others in the corporation seek to defeat those expectations and there exists no effective means of salvaging the investment." (quoting *In re Kemp & Beatley, Inc.,* 484 N.Y.S.2d at 805, 473 N.E.2d at 1179)); *In re Topper*, 433 N.Y.S.2d 359, 365 (1980) (stating that "reasonable expectations constitute the bargain of the parties in light of which subsequent conduct must be appraised," and protecting shareholder's employment despite no such guarantee in shareholder agreement and no explicit state statutory protection of shareholder employment because "generally, there is an expectation on the part of some participants that their interest is to be recognized in the form of a salary derived from employment with the corporation." (citation and internal quotation marks omitted)); *Wilkes v. Springside Nursing Home, Inc.*, 370 Mass. 842, 850, 353 N.E.2d 657, 662–63 (1976) ("[B]y terminating a minority stockholder's employment or by severing him from a position as an officer or director, the majority effectively frustrate the minority stockholder's purposes in entering on the corporate venture and also deny him an equal return on his investment."); 1 F. Hodge O'Neal & Robert B. Thompson, *Close Corporations and LLCs: Law and Practice* §6:2, at 6-4 (3d ed. 2014) ("Increasingly, courts have come to recognize that within many closely held enterprises it is not as easy to separate out the employment relationship from the ownership relationship, and have applied the reasonable expectations approach used more generally in close corporations.").

This reasoning is consistent with our recent holding in *Spacesaver Systems, Inc. v. Adam*, 440 Md. 1, 98 A.3d 264 (2014).[11] In that case, we recognized continuous for-cause

---

[11] We had not decided *Spacesaver* when the Chancellor made her decision in this case.

employment security in a close corporation where a shareholder-employee had a for-cause provision in her employment agreement. *Id.* at 21, 98 A.3d at 276. Because of that written employment agreement, our discussion in that case revolved around contract-based employment security—both written and oral. If we were to adopt the *Gunderson* analysis, as I advocate, we would still leave wholly intact this reasoning while supplementing it with job security born not of contract but of employment-based oppression of a shareholder's reasonable expectations.

Based on these authorities, I would hold that the Chancellor erred in concluding that there was "no legal basis" for Bontempo's claim for damages from his lost employment. I would vacate the Circuit Court's decision and direct that the case be remanded to that Court for consideration of damages or other relief from the Lares' defeat of his reasonable expectation of continued employment, based on the Chancellor's findings that "Bontempo joined Quotient . . . with the express intention of playing a substantial part in the company's growth and financial success" and that he was terminated without cause.[12]

---

[12] I take issue with the Majority's statement that Bontempo "asks that the court enhance the return he receives from his ownership interest by awarding pay-related damages that multiply the monetary award many fold without need for him to have performed any work." Maj. Slip Op. at 31. Of course, wrongfully discharged employees "have a legal obligation to use reasonable diligence in finding other suitable employment and thereby mitigating their damages." Stanley Mazaroff, *Maryland Employment Law* § 5.01[8], at 333 (2d ed. 2001). Thus, Quotient would be entitled to "setoff from the wages and benefits that [Bontempo] lost by reason of the wrongful discharge in the amount of any wages and benefits actually earned following termination, as well as any compensation that [Bontempo] could earn by the exercise of reasonable diligence." *Id.* at 333–34.

14

**OTHER EQUITABLE RELIEF**

The Chancellor's decree, although awarding him damages for the Lares' past defalcations, stopped short of protecting Bontempo's future rights to distribution of profits. "[T]he peculiar duty of a Court of Equity is to supply the defects of the common law, and next, to correct its rigor or injustice." 1 *Commentaries on Equity Jurisprudence* §17, at 17. That Bontempo received distributions during the course of the trial is no surprise. *Bontempo*, 217 Md. App. at 97, 90 A.3d at 568. But the Chancellor's decree offers no meaningful protection against continued oppressive conduct on the part of the Lares once this litigation ceases to be a threat.[13] Once this litigation ends, the Lares are free to return to their previous conduct, giving themselves loans and distributions while stripping Bontempo of the financial fruits of his investment. Or, the Lares may seek to disguise corporate earnings by increasing their own salaries unreasonably, thus decreasing the amounts otherwise available for shareholder distribution. The facts already found by the Chancellor are highly suggestive that such conduct is more than mere fortune-telling.

The tenuous position of the minority shareholder in a close corporation—such as Bontempo—merits special attention when considering the majority's oppressive conduct and the frustration of the minority's reasonable expectations. For this reason, courts often consider all owners in close corporations to have fiduciary duties similar to partnerships. *See, e.g.*, *Walta v. Gallegos Law Firm, P.C.*, 40 P.3d 449, 456 (N.M. Ct. App. 2001) ("To combat such tactics, courts have, over the years, recognized various versions of fiduciary

---

[13] The threat of possibly having to pay Bontempo's legal fees is not much protection, considering the sizable profits earned by this small company.

15

duties that majority or controlling shareholders owe to minority shareholders."); *Hayes*, 173 Or. App. at 265, 21 P.3d at 181–82 ("As is the case among partners, those in control of the affairs of a closely held corporation have fiduciary duties of good faith, fair dealing, and full disclosure toward minority shareholders."); James M. Van Vliet Jr. & Mark D. Snider, *The Evolving Fiduciary Duty Solution for Shareholders Caught in a Closely Held Corporation Trap*, 18 N. Ill. U. L. Rev. 239 (1998) ("Over the years, in a growing number of states where the courts have considered the matter, shareholders in at least certain types of closely held corporations have been held to owe a partner-like fiduciary duty to each other."). In this way, minority shareholders gain some protection from being the victims of a "squeeze-out," like Bontempo. *See*, *Balvik*, 411 N.W.2d at 387 ("Because of the predicament in which minority shareholders in a close corporation are placed by a 'freeze out' situation, courts have analyzed alleged 'oppressive' conduct by those in control in terms of 'fiduciary duties' owed by the majority shareholders to the minority and the 'reasonable expectations' held by the minority shareholders in committing their capital and labor to the particular enterprise."). The Lares, in complete disregard of their corporate partner, and without notice to him, misappropriated large sums of money from the corporation for their own personal use. This conduct merits relief that not only requires return of the misappropriated money, but guards against future abuse of their majority shareholder power.

We have recognized the maxim that "equity will not suffer a wrong to be without a remedy." *Manning v. Potomac Elec. Power Co.*, 230 Md. 415, 421, 187 A.2d 468, 472 (1963). In *Edenbaum*, the Court of Special Appeals adopted from *Baker v. Commercial*

16

*Body Builders, Inc.*, 264 Or. 614, 632–33, 507 P.2d 387, 395–96 (1973), a list of potential

equitable remedies:

> (a) The entry of an order requiring dissolution of the corporation at a specified future date, to become effective only in the event that the stockholders fail to resolve their differences prior to that date;
>
> (b) **The appointment of a receiver**, not for the purposes of dissolution, but to continue the operation of the corporation for the benefit of all the stockholders, both majority and minority, until differences are resolved or "oppressive" conduct ceases;
>
> (c) **The appointment of a "special fiscal agent**" to report to the court relating to the continued operation of the corporation, as a protection to its minority stockholders, and the retention of jurisdiction of the case by the court for that purpose;
>
> (d) The retention of jurisdiction of the case by the court for the protection of the minority stockholders without appointment of a receiver or "special fiscal agent";
>
> (e) The ordering of an accounting by the majority in control of the corporation for funds alleged to have been misappropriated;
>
> (f) **The issuance of an injunction to prohibit continuing acts of "oppressive" conduct and which may include the reduction of salaries or bonus payments found to be unjustified or excessive;**
>
> (g) The ordering of affirmative relief by the **required declaration of a dividend** or a reduction and distribution of capital;
>
> (h) The **ordering of affirmative relief** by the entry of an order **requiring the corporation or a majority of its stockholders to purchase the stock of the minority stockholders** at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price;
>
> (i) The ordering of affirmative relief by the entry of an order **permitting minority stockholders to purchase additional stock** under conditions specified by the court;
>
> (j) An award of damages to minority stockholders as compensation for any injury suffered by them as the result

of "oppressive" conduct by the majority in control of the corporation.

165 Md. App. at 260–61, 885 A.2d at 380–81 (emphasis added). The equitable relief highlighted above in bolded script provides many alternatives the Chancellor could have considered, but did not. Bontempo asked for appointment of receivers, entry of an order reinstating him, dissolution, an injunction, an order permitting him to purchase additional stock, damages, and attorney's fees. Instead, the Circuit Court seemed to focus primarily on the employment-based relief requested by Bontempo, which it erroneously rejected as a matter of law, or alternatively, dissolution.

In its second memorandum opinion, the Circuit Court responded to cross-motions to alter or amend its previous judgment. Bontempo asserted that the court's initial ruling did not grant sufficient relief pursuant to *Edenbaum*.[14] Specifically, Bontempo sought the following relief:

> [a] Appoint an agent to supervise, and to report to the Court, concerning a Court-ordered allocation of Quotient's accounts and other assets on a 55/45 basis, with the Court retaining equitable jurisdiction to grant further relief at a later date or, alternatively direct the Lares to sell their stock to Bontempo under the provisions of the Amended and Restated Stockholders Agreement (ARSA).[15]

---

[14] In each of the three iterations of his complaint, Bontempo had also explicitly referred to *Edenbaum*—along with CA §§ 3-413 and 3-414—as a source of relief.

[15] The Circuit Court rejected this form of relief, stating that "[t]he corporation is not on the brink of insolvency and, in fact, has managed to prosper financially while dealing with this litigation and the strife it has caused all the employees during its pendency." Quotient's financial health has nothing to do with Bontempo's request for an agent to protect his ownership interest from Lare's oppressive actions. Failure to consider whether an agent was necessary to protect Bontempo from oppression was error.

18

[b] Establish accounting procedures.

[c] Allocate certain [Quotient] contracts to Bontempo as a subcontractor to Quotient.

[d] Award Bontempo the salary he has not received since March 2010, in an amount equal to the combined salaries of Clark Lare and Jodi Lare.

[e] Award Bontempo additional attorney's fees and litigation expenses.

[f] Make a finding of fraud and award Bontempo punitive damages.

[g] Require Jodi Lare (majority shareholder) to terminate Clark Lare (minority shareholder) for cause.

[h] Impose personal liability on Clark Lare and Jodi Lare for the damages the Court awarded to Bontempo under Count I of the Second Amended Complaint.

[i] Imposition of a constructive trust.

[j] Make a finding of constructive fraud.

[k] Award other various forms of short term relief.

In addition to the ten equitable remedies advanced by *Edenbaum* (only three of which were expressly addressed by the Circuit Court in its May 8 memorandum opinion), there are a number of other equitable remedies a court could consider in the context of shareholder oppression:[16]

- Cancelling or altering any provision of the articles of incorporation or the bylaws.

- Cancelling, altering or enjoining any resolution or other act of the corporation.

- Directing or prohibiting any act of the corporation or of the shareholders, directors, officers or other persons party to the action.

---

[16] 2 F. Hodge O'Neal & Robert B. Thompson, *Oppression of Minority Shareholders and LLC Members* § 7:24, at 7-200–7-201 (2nd ed. 2014); 2 F. Hodge O'Neal & Robert B. Thompson, *Close Corporations and LLCs: Law and Practice* § 9:41, at 9-277, 9-278 (3d ed. 2014).

- Providing for the sale of all the property and franchises of the corporation to a single purchaser.

- Ordering access to corporate records.

- Defining as constructive dividends any amount paid by the corporation to the controlling shareholders above a "reasonable salary" and ordering the corporation to pay a shareholder discharged without cause an amount per share equal to the constructive dividend.

- Ordering issued stock to be cancelled or redeemed in order to achieve a 50/50 balance or some other ownership structure fair to the shareholders.

- Rescinding a particular corporate act that is unfair to the minority.

- Awarding punitive damages.

- Removing the majority shareholders and putting day to day operation in the hands of employees.

- Awarding plaintiff the value, as nearly as possible, of the plaintiff's rights under the management agreement by giving plaintiff her share of retained earnings, the sum total of profits made since the inception of the company.

- Appointing provisional directors.

In *Bonavita*, *supra*, the New Jersey Superior Court offered a thorough discussion of the alternative remedies in a case involving two 50% shareholders, one of whom was the widow of a former employee of the corporation. The court held that the other 50% shareholder—the company president, who, along with his children, was employed by the corporation—oppressed the widow. *Bonavita*, 300 N.J. Super. at 197, 692 A.2d at 128.

20

After thoroughly considering the options, the Chancery Court ordered a buy-out via the use of a special fiscal agent:

> The order to be entered at this time will direct that the corporation buy the stock. However, *Brenner v. Berkowitz* indicated that in an appropriate case, where there is a need to do so, a court may order that the purchase be made by another shareholder. So here, while a purchase by the corporation is preferable and will be the first option, it is possible that a purchase by Alan Corbo may require consideration. That too cannot now be resolved.
>
> To investigate and consider all of these issues, and any others that must be resolved in order to effect the purchase of the Bonavita stock, **this court will appoint a special fiscal agent.** The agent will consult with the attorneys for the parties; make such independent investigation as may be deemed necessary or appropriate; and may consult with banks, other possible lending sources, accountants, and anyone else deemed helpful. The agent will then submit a proposal as to the terms and conditions on which the sale will take place. The parties will have an opportunity to be heard concerning the agent's report, and thereafter, the court will enter a final order fixing the terms and conditions of sale.

*Id.* at 201, 692 A.2d at 130 (emphasis added).

Many of the above forms of equitable relief—either in isolation or operating in tandem—could offer Bontempo meaningful relief such that his objectively reasonable expectations would be met. Not only would they rectify the oppressive conduct that forced Bontempo out of his job, but also these remedies could guard against continued oppressive conduct on the part of the Lares vis-à-vis shareholder distributions. I would remand with instructions that the Chancellor consider these remedies against continued oppressive conduct. Although none of these equitable remedies must be granted, the Chancellor

should consider them free from the strictures of at-will employment she imposed upon herself.

Judge Harrell has authorized me to state that he joins in the views expressed in this dissenting opinion.